THE STATE OF DELAWARE, upon the relation of David P. Waldman, v. THE MILLER-WOHL COMPANY, INC., a corporation of the State of Delaware.

(*September* 9, 1942.)

TERRY, J., sitting.

*John J. Morris, Jr.* (of Hering, Morris, James and Hitchens) for the relator.

*Aaron Finger* (of Richards, Layton and Finger) for the respondent.

Superior Court for New Castle County, No. 161, November Term, 1941.

**TERRY, J.:**

■■ In discussing the jurisdiction of this Court relative to the first question involved, it is axiomatic that any interest sought to be secured or enforced by writ of mandamus must constitute a clear legal right existing in the relator at the time of the application. *State v. Simmons*, 3 *Penn.* 291, 50 A. 213. The writ will never issue in doubtful cases. *Road Commissioners v. New Castle*, 2 *Penn.* 466, 47 A. 374. Nor will the writ issue to enforce a right found to be in substantial dispute, or a right which is inchoate or prospective. 38 C. J. 582.

■ It is apparent that the problem involved is not whether this Court has the power to undo an act already done, but, instead, to determine whether or not the act was properly done. I am of the opinion that the power exists to examine Article 4 of the charter authorizing redemptions, and to examine also the resolution—wherein the relator's shares were purported to be redeemed—in order to determine as to whether or not the method pursued was consistent with the power granted, so that I may conclude whether the relator at the time his petition was filed was possessed of the right to seek the remedy herein prayed for. *People ex rel. Colby v. Imbrie & Co.*, 126 Misc. 457, 214 N. Y. S. 53;

*State ex rel. Walker v. Harrington and Terry, 3 Terry* (42 *Del.*) 14, 27 A. 2d 67.

■■ Now, in determining as to whether or not the right exists it should be said that all external aids, and especially arbitrary rules, applied to the construction of contracts such as before me are more or less of uncertain value and Courts should not resort to their use without hesitation, and then with much circumspection. The object of construction is to ascertain the true intent from the words used, not how meaningless the words can be made by the application of any given rule. I do not mean that given rules such as the ejusdem generis rule do not have their proper applications. Yet, they never spring into operation unless an ambiguity exists veiling beyond true comprehension an accurate interpretation of the language used. The immediate problem is to ascribe the proper meaning to the words "or otherwise." If the intent so requires, the words "or otherwise" as used should be construed without reference to the ejusdem generis rule, and may be given such a scope as the context might seem to require.

When the pertinent language contained in Article 4 is read, it is found "in case less than all of the Class A stock is to be redeemed, the amount to be redeemed and the method of effecting such redemption * * * may be determined by the Board of Directors." Now, if this language stood alone, there could be no question but what the method to be selected would lie within the unrestricted discretion of the Directors. However, the clause continues "by lot or pro rata or otherwise." What did the framers of this language intend? Did they intend that the words "by lot or pro rata" should be construed to be superfluous, or, at best, suggestive in nature, and the words "or otherwise" to engulf an unrestricted grant of power, or did they intend that the words "by lot or pro rata" should be given the meaning properly ascribed to them, and the general words "or otherwise" have a mean-

ing consistent therewith? The phrase "or otherwise" in everyday parlance means "or in any other way." "Otherwise" is defined by Webster as "in a different manner, in other respects."

The defined meanings of the words "or otherwise" does not of necessity impel a construction that they were used in their broadest sense. Naturally, a method selected other than "by lot or pro rata" would necessarily have to constitute a different method of redemption. The question is: Whether the method should conform in principle with the methods "by lot or pro rata"? I find no ambiguity in the language used. It is evident to me that the framers of Article 4 intended by the language used to ascribe to the words "or otherwise" a meaning such as "in like manner," thereby insuring, so to speak, fairness, as used in a restricted sense, and equality to all of the holders of the Class A stock. In construing the clause before me I find that the word "effecting" is limited or modified by three adverbial constructions in parallel function, and the adverb "otherwise" is equivalent to the classification and intent of the two previous adverbial phrases. The reading of the adverbial constructions are thus equivalent to "by lot, by pro rata, or in like manner." To reach any other conclusion would be to defeat the object sought. I, therefore, must conclude that the resolution clearly shows on its face that the method selected was not contemplated under the charter provision, and, therefore, the relator's status as a stockholder was not changed by the adoption thereof, and that he is possessed with sufficient right to seek the remedy herein prayed for.

Prior to discussing the merits surrounding the relator's application, it should be stated that the right to examine corporate books and records under the circumstances of this case is derived from the common law. *State v. Jessup & Moore Paper Co., infra.* The right is not absolute and is

never granted to satisfy the fancy or curiosity of an idle mind, nor the minds of those who are prone to remote or speculative imagination. It is exercised only when the reason sought is found to be embodied in good faith and for a specific and proper purpose. *State ex rel. Miller v. Loft*, 4 *W. W. Harr.* (34 *Del.*) 538, 156 A. 170; *State v. Jessup & Moore Paper Co.*, 1 *Boyce* 379, 77 A. 16, 17, 30 L. R. A. (N. S.) 290.

The parties are not in accord concerning the burden of proof. The Courts of this State have not passed directly upon this question. However, language, from time to time, has appeared in our reported cases, the import of which would lead to the conclusion that the burden was upon the relator to prove his good faith and proper purpose.

In the case of *State ex rel. Miller v. Loft*, 4 *W. W. Harr.* (34 *Del.*) 538, 543, 156 A. 170, 172, the Court, dealing with the question of proper motive on the part of the relator, stated, since the right of inspection was not absolute, "such purpose must not only be proved, but must, also, be alleged not by a mere bare general statement that it is a proper one, but by the allegation of specific facts, from which the propriety of such purpose will appear."

In the case of *State ex rel. Theile v. Cities Service Co.*, 1 *W. W. Harr.* (31 *Del.*) 514, 518, 115 A. 773, 775, 22 A. L. R. 8, the Court stated, "at common law, the right to inspect corporate books was a qualified right, and allowable only when the stockholder was actuated by motives that were lawful and proper and by a purpose to subserve his interests as a holder of the corporate stock. And, accordingly, the petitioner was required to bring his case by adequate averments in his petition, within the limitations of the right above indicated."

It must be borne in mind that the writ is not issuable as a matter of course; on the contrary, it is issued only

upon sound judicial discretion—consequently, it is mandatory upon the relator seeking the examination not only to allege, but, in my opinion, to prove a proper motive or purpose, which would properly cause the Court to exercise its judicial discretion in his favor.

It is admitted that the allegations contained in the petition as filed are adequate.

In approaching an analysis of the testimony, one must bear in mind certain basic or fundamental principles of corporate purpose. A corporation has been judicially defined as "an artificial being, existing only in contemplation of the law; a legal entity, a fictitious person, vested by law with the capacity of taking and granting property and transacting business as an individual. It is composed of a number of individuals, authorized to act as if they were one person. The individual stockholders are the constituents or component parts, through whose intelligence, judgment, and discretion the corporation acts." *Jones v. Williams*, 139 Mo. 1, 39 S. W. 486, 490, 40 S. W. 353, 37 L. R. A. 682, 61 *Am. St. Rep.* 436.

The stockholders of a corporation are the equitable owners of its assets. They have a well defined interest in its present and future welfare, including its entire policy of operation. The officers of a corporation are persons entrusted with the duty of proper management. They act in a fiduciary capacity for the benefit of the corporation and its stockholders, and they should be ready and willing to account to the stockholders for their acts at all reasonable times. The fact that the officers manage the corporation does not to any extent take away from the stockholders the right to inspect their records and accounts to ascertain whether they are faithful, honest and intelligent in the performance of their duties. *Varney v. Baker*, 194 *Mass.* 239, 80 N. E. 524, 10 *Ann. Cas.* 989. We must not

lose sight of the fact that a share of stock represents capital invested, and the purchaser becomes thereby a part owner in the venture. It would be foolhardy and unwise to say to any owner that he has no right to inquire into the value of his investment, provided his purpose be proper, unless an injury to the corporation or other stockholders could be shown in the granting of such request.

The evidence is voluminous. Space will not be taken to attempt to discuss each conflict thereof. A brief resume of the facts essential to a proper determination are as follows:

The respondent is a Delaware corporation duly organized under the laws of this State in the year 1932. Its main object or purpose in business is the operation of a chain of retail stores for the sale of women's wearing apparel in the South and Middle West. The capital stock structure of the respondent has heretofore appeared under Article 4 of the charter. The relator is the registered owner of 125 shares of the Class A stock, which he received in the year 1932 as exchange for stock held by him in a New York corporation of similar name, for which he had paid the sum of $12,500. The total assets of the predecessor corporation were taken over by the respondent during 1932. At the hearing the respondent disclosed its current assets to be $1,500,000 as against its current liabilities of $1,200,000.

The testimony further reveals that the relator made his investment in the Class A shares at the suggestion of one Louis Friedman, a mutual friend of the relator and the officers of the respondent, who guaranteed the relator that he would not suffer a loss therefrom; that from time to time the relator became in need of funds, and as of 1941, Friedman had advanced to him the sum of $8,500, and received as security the relator's stock certificate representing the 125 shares of Class A stock endorsed in blank. It was decided between the relator and Friedman in March of 1941

to ask the officers of the respondent to redeem the 125 shares, in order that both the relator and Friedman would have available cash. The Class A stock carried a 5% non-cumulative dividend. During the relator's tenure of ownership the dividends paid were as follows: In the year 1935—$2.50 a share; 1936—$5.00; 1937—$2.50; 1939—$2.50; 1940—$2.50. Throughout the year 1932, 1933, 1934 and 1938 no dividends were paid. The corporation during its years of existence never rendered to the relator a financial statement concerning its operation. The relator's 125 shares of the Class A stock, together with 45 shares owned by the estate of Rose, Seigfried of Saint Louis, constituted all of the Class A shares owned by persons not officers, employees or members of their respective families.

Friedman as agent of the relator held three conferences with the officers of the respondent—the first on March 8th, the second on March 11th, and the third on March 13th. The purpose for the conferences was to request that the respondent redeem the shares of the relator in accordance with the charter provisions. There is a marked difference of opinion as to what took place during these conferences. The relator contends that the officers of the respondent refused to redeem the shares, stating that the financial condition of the respondent would not justify such a course, as the corporation was just getting out of the red, was short of funds, and was entering into a dull season of the year; that the officers offered him $9,375 or 75 per cent of his investment of $12,500 for his shares, stating that they had not paid more than 50 per cent for any shares purchased by them, but, since their feeling toward the respondent was most friendly, they would offer him 75 per cent on the dollar invested; that the offer was refused as being unfair and unjust, and was an attempt on the part of the officers to deprive the relator of 25 per cent of his money honestly invested; that further negotiations concerning redemption ceased.

The officers on the other hand admit that the financial condition of the respondent did not justify the redemption of the relator's shares as of March 13, 1941; however, they contend that they did not offer the relator $9,375 for his shares, but instead offered him $10,000, or approximately 80 per cent of his investment of $12,500, and that their reason for not offering more was that they would have to borrow the money to purchase the shares and pay interest thereon; that they never stated to the relator, or his agent Friedman, that they paid 50 per cent for all of the Class A shares purchased by them from others, as they paid only 50 per cent in one case, and that occurred where the owner was an employee and leaving the employment of the respondent, which occurred in the year 1933; that since 1933 they have purchased Class A shares, but paid from 90 per cent to 100 per cent on the dollar for all purchased.

The relator contends that, since the respondent could not redeem his shares without jeopardizing its financial position, and, since the declaration and payment of dividends had been irregular, and, since he had never received a financial statement from the respondent, together with the fact that the officers' tender of purchase was considerably less than his investment, his investment was of sufficient amount to justify him in making a request to examine the books of the respondent to ascertain the true value of his shares. To this end the relator by his agent Friedman directed the following letter to the respondent on the 13th day of March, 1941:

"March 13th, 1941.

"The Miller-Wohl Company, Inc.,
"112 West 38th Street,
"New York City.

"Attention: Mr. Max L. Tomber,
"President.

"Dear Mr. Tomber:

"My brother-in-law, Dr. Waldman, is the owner of record of 125 shares of Class A stock of The Miller-Wohl Company, Inc. His certificate of stock #40 was endorsed to me for certain loans so that between us we have both legal title to the stock as well as the beneficial interest.

"Neither the doctor nor I have ever received any financial statements or reports of the company since its inception. It has always been a source of surprise and shock to us, particularly in the last few years, when retail ladies' ready-to-wear business has been pretty good, that only 2½% has been paid on our stock when the stock was a 5% non-cumulative stock.

"We would really like to know what, if anything, our stock is worth and what the prospects for it are in the future. To that end, we would appreciate it if our accountant, Mr. Lobell, whom you know well, could be permitted to make an examination and audit of the books of the company and report back to us. Such an audit, of course, will be at our cost and expense and Mr. Lobell will be glad to give you a copy of his report when he is finished.

"As a stockholder, and particularly in view of the fact that we never received a statement or report of the company since its inception, we are legally entitled to such an examination and your own attorney, Mr. Buchter, will confirm this.

"Please, therefore, let me know as soon as possible when it will be convenience for Mr. Lobell to come down to your office to make his examination.

"With best of wishes for the future—

"Very truly yours,

"(Signed)    Louis Friedman

"P. S. We presume that you will refer this request to Mr. Buchter, and so as to expedite matters we are sending him a copy of this letter."

Neither the relator nor Friedman received a reply to the letter of March 13th, and so directed the following second letter to the respondent on April 4th:

"April 4th, 1941.

"The Miller-Wohl Company, Inc.,
"112 West 38th Street,
"New York City.

"Attention: Mr. Max L. Tomber,

"President.

"Dear Mr. Tomber:

"More than three weeks ago, I wrote you a letter requesting that Mr. Lobell be permitted to make an audit and examination of the books of your company. So far I have not received any reply to my request.

"Since my letter to you, I have obtained a Dun's report of the company. Dr. Waldman and I have read the same with a great deal of interest and amazement, particularly in the light of its profits and of the history of the company's payments of dividends on the Class A stock, *which is not cumulative.*

"The Dun's report of course is not complete—does not furnish any operating statements and leaves quite a bit to the imagination.

"An audit or examination by Mr. Lobell, whom you well know, on behalf of Dr. Waldman and myself, who are not in a competitive business with you, at a time and place convenient to you so as not to interfere with your business, could only be productive of information and suggestions for

the benefit of all stockholders. I therefore cannot understand why I have not already heard from you in answer to my letter of March 13th last, advising me when it would be convenient for Mr. Lobell to make his examination and audit.

"I am not asking for anything unreasonable or for something that we are not entitled to and am beginning to wonder why the delay or failure on your part to answer my previous letter.

"I must insist, politely and in the friendliest of spirits, but nevertheless firmly, for an immediate reply to my request of March 13th last.

"Very truly yours,

"(Signed)   Louis Friedman

"Copy to Morris Buchter, Esq.,
"c/o Buchter, Rathheim, Abrams & Holz,
"61 Broadway, New York City."

No reply having been received to the letters of March 13th and April 4th, the following third letter was directed to the respondent on April 11th:

"April 11th, 1941.

"The Miller-Wohl Company, Inc.
"112 West 38th Street,
"New York City.

"Attention:  Mr. Max L. Tomber,

President.

"My dear Mr. Tomber:

"I wrote you on March 13th and again on April 4th, 1941, requesting that Mr. Lobell be permitted to make an audit and examination of the books of your company. Copies

of each of my letters were forwarded to your attorney, Mr. Buchter.

"No reply was received by me either from you or from your attorney.

"In view of that, I am advising you that unless we receive such permission for Mr. Lobell to make his audit and examination of your books and records, within 5 days from the date of this letter, I shall instruct my attorneys to apply to the Courts for an order permitting such an examination, and as the lawyers say, for such other and further relief that the Courts can give.

"For all purposes, I am forwarding this letter to you by hand and am likewise sending a copy of this letter by hand to your attorney, Mr. Buchter.

"Very truly yours,

"(Signed)   Louis Friedman

"By Hand"

No reply was received to the relator's letter of April 11th; however, on May 9th the respondent directed a letter to the relator (heretofore set out), together with the resolution of the Directors, setting forth their action in redeeming his shares.

The officers of the respondent admit receipt of the relator's letters, and give as a reason for not answering them that they did not consider the relator to be serious pertaining to his request; on the contrary, they determined he was merely spurring them on to devise a plan or means to redeem the relator's shares.

The respondent argues, notwithstanding the fact that the relator's letters were not answered, that inspection should be denied; first, because the respondent had no knowledge that Friedman was empowered to act for the relator;

second, because the relator's request is founded in bad faith, as his purpose is to vex and harass the respondent and its officers.

Now, as to the first reason advanced, a reading of the record clearly denotes the authorization of Friedman to act as the agent of the relator in requesting inspection, and the President and officers of the respondent must be held to have had such knowledge. As to the second reason advanced, I am of the opinion that the relator has proven his purpose to be proper, and I cannot conclude that his request was conceived in bad faith.

It appears to me that a fair inference to be drawn from the testimony of the officers of the respondent would be to say that the underlying reason for denying inspection was predicated upon their (the officers) lack of confidence in Mr. Lobell, the accountant selected by the relator to conduct the examination. I reach this conclusion based upon the following questions directed to the President of the respondent, and his answers thereto: "Q. Why didn't you on one of those occasions (referring to letters) say, 'Send Mr. Lobell up and let him go over our books'?" "A. Because, if you knew Mr. Lobell like I do, you would not want Mr. Lobell to go over your books." "Q. Why didn't you suggest some other accountant and say, 'We don't like Mr. Lobell'?" "A. Mr. Friedman didn't suggest it."

Concluding as I have, that the relator is entitled to examine the books of the respondent to ascertain the true value of his shares, I now reach the question as to how comprehensive such as examination should be.

The relator argues that such an examination should cover the years beginning with 1932 down to and including the year 1941, as he argues it might be found that more dividends should have been declared and paid to the relator covering that period, or that dividends were paid

on other shares before paying the full dividend of 5% on the Class A stock. He further argues that such an examination might reveal that the officers of the respondent may have paid themselves salaries far in excess of any sum that would be found to be reasonable. I cannot concur in the relator's argument. The petition is devoid of any allegation denoting or suggesting fraud or wrongdoing on the part of the officers of the respondent concerning their management of corporate affairs, and, further, I find no evidence that would justify me in drawing any inference that such was the case. The argument of the relator in this respect must be found to be imaginary, speculative and remote, which would not form the proper basis for such an examination.

The relator has alleged in his petition that he is interested only in determining the true value of his shares. Such an examination should not be difficult, and the parties should be able to determine what books and records are necessary to accomplish such an end, and, further, should be able to agree upon a proper person to conduct such an audit. However, if they cannot so agree, an order for the issuance of a peremptory writ of mandamus for the inspection of such books and records as will carry this opinion into effect will be signed by the Court.