FLEISHER DEVELOPMENT
CORPORATION, et al.,
Appellants,

v.

HOME OWNERS WARRANTY
CORPORATION, et al.

FLEISHER DEVELOPMENT
CORPORATION, et al.

v.

HOME OWNERS WARRANTY
CORPORATION, et al.,
Appellants.

Nos. 87–7162, 87–7170.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 2, 1988.

Decided Sept. 2, 1988.

**1530**

William E. Rollow, Washington, D.C., for appellants/cross-appellees.

William C. Casano, Washington, D.C., for appellees/cross-appellants.

Before STARR and WILLIAMS, Circuit Judges, and WEIGEL *, Senior District Judge.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

■ One of the basic incidents of corporate ownership is the right of shareholders, secured initially at common law and in more modern times regulated by statute, to inspect the books and records of the corporation whose stock they hold. This diversity case involves an inspection right claim, under Delaware law, in a less typical setting, namely a non-stock mutual corporation. Such corporations have members, not shareholders. The principles, happily, are the same, notwithstanding the less familiar corporate structure. The questions before us are two: the principal issue is whether, under the strictures of Delaware law, the District Court erred in crafting the specific inspection order that is now before us for review. The second question is whether the trial court properly dismissed a claim brought under the antifraud provisions of the federal securities laws.

For the reasons that follow, we uphold in full the District Court's resolution of the inspection question. We are constrained, however, to remand the securities law claim for further consideration.

I

Plaintiffs (hereinafter "Fleisher") are builders and developers of residential housing. They are also members of Home Warranty Corporation ("HWC"), a non-stock, for-profit mutual corporation. HWC is incorporated in Delaware, with its principal office in the District of Columbia. HWC has two wholly owned subsidiaries: Home Owners Warranty Corporation and HOW Insurance Company. With apologies for the proliferation of acronyms, we shall dub the former, "HOW," and its insurance progeny, "HOWIC." Through HOW, HWC operates the HOW Warranty Program for the benefit of its builder-members. That program provides a limited warranty to homeowners who purchase new homes from members of the mutual. The warranty is backed by the insurance of the program's underwriter, HOWIC. A Delaware stock corporation, HOWIC qualifies in that State as an insurance company; it operates throughout the United States as a "risk retention group" pursuant to the Product Liability Risk Retention Act of 1981 ("PLRRA"), 15 U.S.C. § 3901 et seq. (1982), which we describe briefly in the margin.[1]

---

* Of the United States District Court for the Northern District of California, sitting by designation pursuant to 28 U.S.C. § 294(d).

1. PLRRA is designed to "reduce the problem of the rising cost of product liability insurance by permitting product manufacturers to purchase insurance on a group basis at more favorable rates or to self-insure through insurance cooperatives called 'risk retention groups.'" H.R.Rep. No. 190, 97th Cong., 1st Sess. 4, *reprinted in* 1981 U.S.Code Cong. & Admin.News 1432, 1432. The statute encourages the formation of such "risk retention groups" by exempting them from the requirements of various state laws that

## A

Understanding the structure of the HOW program is, alas, necessary before we address the issues in this case. Homebuilders participating in the program pay an initial registration fee of $200 and an annual reregistration fee of $100. In addition, builder-members pay premiums for warranty coverage on each home that they enroll in the program. Individual premium rates are assessed against each home's sales price and are based on several factors: length of membership in HOW, number of claims incurred, and geographical area. J.A. at 165 ("Membership in the HOW Mutual"). In addition to the foregoing sources of funds, HOW raises capital through a flat enrollment fee assessed against each home. A HOW program pamphlet describes this obligation in the following way:

> [E]ach HOW member will be required to make a per house enrolled capital contribution in an amount NOT TO EXCEED $25 for a period NOT TO EXCEED 5 years.
>
> A separate capital account will be maintained for each member. The member will vest the capital contribution in five years. At the end of five years, a member who voluntarily leaves the HOW program, and is in good standing when he leaves, will be entitled to a full refund of his 5 year capital contribution.

J.A. at 171 ("The New HOW") (emphasis in original).

## B

The events giving rise to this lawsuit began in 1985 when several builder-members submitted identical written requests to HWC asking that they be allowed to inspect certain book and records of HWC and its subsidiaries. *See* April 16, 1985 Affidavit of Thomas A. Paparone, Exhibit A to HWC's Motion for Summary Judgment; J.A. at 194. Plaintiffs identified as their purposes the following:

> (a) To apprise [plaintiffs] of the financial and operating condition of ... [HWC] (and its subsidiaries)....
>
> (b) To allow [plaintiffs] to ascertain whether or not ... [HWC] and its subsidiaries are being prudently managed, particularly with regard to its fiscal affairs.
>
> (c) To allow [plaintiffs] to ascertain whether the rates being charged to Builder Members (whether on a progressive scale or not) are being applied uniformly to Builder Members.
>
> (d) For such other purposes as may be legal and proper.

Paparone Affidavit; J.A. at 195. Each builder-member requesting inspection claimed that it was acting in good faith and promised to keep the information confidential, particularly from competitors.[2]

HWC responded that it was "ready, willing and able to comply with requests for information supported by a proper purpose," April 22, 1985 Letter of Hamilton H. Boykin, Exhibit B to HWC's Motion for Summary Judgment, J.A. at 199, but claimed that plaintiffs had failed to demonstrate such a purpose.

## C

Thus rebuffed, Fleisher repaired to federal district court. Two counts of its amended complaint remain relevant on appeal. Count II sought declaratory and injunctive relief permitting plaintiffs to inspect the books and records of HWC and its subsidiaries. Count IV alleged violations of federal securities laws. As to the

---

would inhibit their formation. Legislation at the federal level was thought necessary to permit product sellers located in several States to form such groups. *Id.* at 6, 1981 U.S.Code Cong. & Admin.News at 1434; *see also infra* n. 3.

**2.** Each plaintiff covenanted as follows:
[Plaintiff] warrants and agrees that it will not disclose such information to any party other than to (1) Its officers, attorneys, and/or ac-

countants or (2) to such court or courts as may be appropriate; or (3) to such other Builder Members of [HWC] as may have a common interest in the well being of said corporation, the name of which will be supplied in advance to [HWC] and which, likewise agree to keep such information confidential.
Paparone Affidavit; J.A. at 196.

latter count, Fleisher alleged that the required $25 per home capital contribution qualified as an "ownership interest" within the meaning of the PLRRA, *see supra* n. 1, and therefore was subject to the antifraud provisions of the federal securities laws.[3] Fleisher contended that HWC violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (1982), by charging a reduced rate to certain large builders and by failing to disclose this information to Fleisher (or, alternatively, by affirmatively misleading Fleisher with respect to the enrollment amounts). *See* Amended Complaint ¶¶ 54–59; J.A. at 130–31.

In the wake of HWC's motion to dismiss, the District Court filed a memorandum opinion (*Fleisher I*), disposing of all counts of Fleisher's amended complaint, save for Count II. Pertinent for our purposes, the District Court treated HWC's motion with respect to Count IV as one for summary judgment and entered judgment in HWC's favor. The court observed that, although the parties vigorously disagreed whether the capital contributions constituted "ownership interests," it "need not resolve this thorny issue ... because official HOW documents submitted by plaintiffs themselves put plaintiffs on notice that not every builder would be charged the same enrollment fee." Slip op. at 13; J.A. at 187. The District Court pointed to the two HOW pamphlets noted above, both of which stated that a member's capital contribution "will not exceed $25." *See* The New HOW; J.A. at 169; and Membership in the HOW Mutual; J.A. at 163. The District Court reasoned that, by virtue of these two publications, plaintiffs "were on notice that the enrollment fees might vary," slip op. at 13; J.A. at 187, and therefore could not have been misled by HWC about the variance in capital contributions.[4]

Two months later, HWC moved for summary judgment on Fleisher's remaining claim (Count II) concerning inspection of HWC's books and records; Fleisher likewise moved for summary judgment. In a published opinion, 647 F.Supp. 661 (D.D.C. 1986) (*Fleisher II*), the District Court granted Fleisher's motion for summary judgment as to the issue of its right to inspect the books and records of HWC and its subsidiaries. The District Court reasoned that under Delaware law, the common-law right of shareholders to inspect corporate books and records extended to members of non-stock corporate mutuals and had not been supplanted by statutory schemes dealing with inspection rights in the case of shareholders in a stock company. The court observed that "[w]hether a stockholder or a member, the common law requires the assertion of a 'proper purpose' before a corporation must yield up its books, records and membership lists to a request for inspection," *id.* at 668, and held that it was Fleisher's burden to demonstrate a proper purpose for the inspection. The District Court recognized that "[t]he pivotal question," then "is what constitutes a proper purpose under the common law." *Id.*

Relying on a 1905 United States Supreme Court case, the District Court held that plaintiffs should be entitled to inspection of HWC's books " 'though their only object is to ascertain whether their affairs have been properly conducted by the directors or managers.' " *Id.* (quoting *Guthrie v. Harkness*, 199 U.S. 148, 154–55, 26 S.Ct. 4, 6, 50 L.Ed. 130 (1905)). The District Court quoted extensively from *Guthrie* to demonstrate the ease with which a shareholder could establish a proper purpose for inspection at common law:

"Such a right is necessary to their [shareholders'] protection. To say that they have the right, but that it can be

---

**3.** Section 5 of the PLRRA provides that "[t]he ownership interests of members in a risk retention group should be ... considered to be securities for purposes of the provisions of section 77q of this title [section 17 of the Securities Act of 1933] and the provisions of section 78j of this title [section 10 of the Securities Exchange Act of 1934]." 15 U.S.C. § 3904(a)(2) (1982).

**4.** For reasons that we are unable to ascertain on the record before us, the District Court analyzed plaintiffs' securities law claim under section 17(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(2), rather than under section 10(b) of the Securities Exchange Act of 1934. It was solely the latter section upon which Fleisher relied in its amended complaint.

enforced only when they have ascertained, in some way without the books, that their affairs have been mismanaged, or that their interests are in danger, is practically to deny the right in the majority of cases."

*Id.* (quoting *Guthrie*, 199 U.S. at 154–55, 26 S.Ct. at 6). The District Court identified as improper a request for inspection " 'for speculative purposes or to gratify idle curiosity or to aid a blackmailer.' " *Id.* (quoting *Guthrie*, 199 U.S. at 156, 26 S.Ct. at 6). Such rather extreme instances of bad faith aside, however, the trial court held that "the right to inspect should 'not be denied to the stockholder who seeks the information for legitimate purposes.' " *Id.* (quoting *Guthrie*, 199 U.S. at 156, 26 S.Ct. at 6).

Under the standard enunciated in *Guthrie*, the District Court had little trouble in concluding that Fleisher had demonstrated a proper purpose. One stated reason for Fleisher's request was to ascertain whether the company was "being prudently managed, particularly with regard to its fiscal affairs." *See supra* p. 1531. This alone was deemed sufficient to support inspection. Moreover, as we noted above, plaintiffs' demand letters had set forth assurances of good faith and confidential treatment of information. Against that, HWC had "proffered no evidence that the plaintiff's [sic] motives are clearly improper." *Id.* The court concluded that Fleisher had met its burden to prove a proper purpose and, accordingly, ordered inspection of the books and records of HWC and its subsidiaries upon seven days notice.

### D

In response, HWC filed a Rule 59 motion, *see* Fed.R.Civ.P. 59, contending that the District Court had misapprehended Delaware common law with respect to the prerequisites to shareholder inspection and that the District Court's order encompassed materials as to which the plaintiffs did not have a common-law inspection right.

As we shall presently describe in fuller detail, HWC's Rule 59 motion ultimately bore fruit when, some eight months later, the District Court amended its order to limit the scope of Fleisher's inspection. In the meantime, anxious to commence the inspection permitted by virtue of the District Court's order in *Fleisher II*, plaintiffs filed a motion for injunctive relief, requesting the court to grant an immediate inspection of HWC's books and records. Fleisher attached to its motion an affidavit, with supporting documents, describing the existence of a "super builder" program adopted without the knowledge of other HOW members. The program allegedly provided HOW program benefits to certain select members at substantially more favorable terms and rates. The affidavit went on to aver that a large Texas builder, Nash Phillips/Corpus, Inc. ("NPC"), had participated in HOW's "super builder" program, but had recently filed for bankruptcy. Fleisher claimed that the "super builder" program in general and NPC's bankruptcy in particular threatened to undermine the continued viability and financial stability of the HOW program.

The District Court never ruled on Fleisher's motion for injunctive relief. Instead, in a published opinion and order, 670 F.Supp. 27 (D.D.C.1987) (*Fleisher III*), the District Court granted HWC's Rule 59 motion to the extent of limiting the scope of the authorized inspection. In so doing, the court concluded that it had erred in relying on *Guthrie* as setting forth Delaware law with respect to inspection rights. Upon examining more recent Delaware cases, the trial court was persuaded that "the Delaware judiciary has revisited the issue under review and has departed from the rule set down by the Supreme Court in *Guthrie*." 670 F.Supp. at 28.

Judge Gasch explained Delaware's departure from the *Guthrie* rule as follows:

> Under the Supreme Court's formula, there is a presumption that inspection will go forward unless it is "for speculative purposes or to gratify idle curiosity or to aid a blackmailer." *Guthrie, supra*, 199 U.S. at 156, 26 S.Ct. at 6. To the contrary, Delaware has created a presumption against permitting inspection of a corporation's books and records

**1534**

unless there is a specific dispute between the shareholder or members and the corporation in aid of which examination is necessary. Delaware requires a plaintiff to plead this proper purpose with particularity. A plaintiff's failure to be sufficiently specific will result in the dismissal of his request to inspect for failure to make out a *prima facie* case of proper purpose. Delaware appears to have added this requirement to ensure that an inspection will advance the interest of the corporation and is not a mere "fishing expedition."

*Id.* at 29–30 (citations omitted). The District Court surveyed relevant Delaware caselaw and concluded that "[t]hose courts considering the issue have uniformly denied common law inspection of a corporation's books and records where the requisite specificity of pleading is lacking." *Id.* at 30.

Of Fleisher's four stated purposes for demanding inspection, only its claim that the rates being charged to members were not being applied uniformly was of sufficient specificity, in the District Court's view, to assure that the inquiry was not merely a "fishing expedition." Accordingly, the court found "Fleisher's request to inspect HWC's books and records for the limited purpose of determining whether HWC's rate schedules are improperly discriminatory particular enough to satisfy Delaware law." *Id.* at 32. Inspection was thus permitted, but "limited to those books and records which are essential to determining whether HWC's rates are being uniformly or discriminatorily applied." *Id.*[5] The District Court amended its inspection order accordingly.

On appeal, Fleisher claims that the District Court erred, *first*, in limiting the scope of its permitted inspection and, *second*, in dismissing Count IV of its amended complaint alleging violations of federal securities law. In addition to opposing these contentions, HWC has cross-appealed claiming that the District Court erred in permitting plaintiffs any inspection at all.

## II

### A

The District Court correctly perceived that the courts of Delaware have revisited the issue of shareholders' inspection rights since the United States Supreme Court handed down its decision in *Guthrie*. We glean several principles from our reading of the post-*Guthrie* Delaware cases.

For one thing, it is clear that the burden rests on the shareholder to show a "proper purpose" in demanding inspection. *Nodana Petroleum Corp. v. State*, 50 Del. 76, 123 A.2d 243 (1956). A "proper purpose," we hasten to observe, is one reasonably related to the plaintiff's interest *as a shareholder* (or member) in the corporation. *Helmsman Management Services, Inc. v. A & S Consultants, Inc.*, 525 A.2d 160 (Del.Ch.1987).[6] To carry its burden to show a proper purpose, the shareholder must allege in its pleadings or demand letter facts sufficiently specific such that "mention of them [would] tend[ ] to show that plaintiff was not merely on a fishing expedition and that he had some specific basis for his demand." *Nodana, supra*, 123 A.2d at 246. Finally, as we will set forth in greater detail below, the scope of the inspection granted "should be reasonably confined to information concerning the event or circumstances which caused the shareholder to become interested in the first place." *Skoglund v. Ormand Industries*, 372 A.2d 204 (Del.Ch.1976).

The Delaware Supreme Court's decision in *Nodana Petroleum Corp. v. State*, 50

**5.** In addition, the court ordered that "Fleisher cannot review any books and records which it did not request access to in its letters," 670 F.Supp. at 32, reasoning that "it is only as to these that a proper demand has been made." *Id.*

**6.** Although *Helmsman*, and several other cases to which we refer, involve Delaware's statutory right of inspection, we think it helpful to look to Delaware decisions construing the statutory right to inspection for guidance in filling in the interstices of Delaware common law. In any event, *Nodana*, upon which we most heavily rely, cites no statutory provision and appears to construe the common law of Delaware.

Del. 76, 123 A.2d 243 (1956) provides a concrete factual setting illustrating the foregoing principles. As the parties tussle at length over *Nodana*'s meaning, we pause to examine that case. In his opening request for inspection, the Nodana shareholder indicated, in rather general fashion, that his interest was prompted by "concern[ ] that improper transactions might have occurred" and that he wished to inspect the company's books "in order to determine to my own satisfaction the extent, if any, to which such transactions might have occurred and to otherwise inform myself of the affairs and activities of the Company in order to adequately protect and evaluate my interest as a stockholder." *Id.*, 123 A.2d at 245. After having been rebuffed by the corporation for failure to state a proper purpose, the shareholder in short order renewed his request. This time, however, the shareholder added to his inspection request a demand that Nodana rescind three specified transactions. The company again refused to permit inspection, whereupon the shareholder brought a mandamus action in the Delaware courts. The state trial court ordered inspection, but limited its scope to documents that "should or may pertain ... to ... [specified] transactions," *id.* at 246, apparently those that the Nodana shareholder had identified in his second demand letter.

On appeal, the corporation argued in favor of the following proposition:

A stockholder seeking mandamus to compel inspection of the corporate records and books of account (other than the stock ledger), must ... affirmatively alleged and prove a proper purpose communicated to the corporation prior to suit, a demand to inspect, and refusal.

*Id.* at 245.

The state supreme court assumed that the corporation accurately stated Delaware law, *see id.* at 246 n. 1, and found that the criteria had been satisfied. The court's reasoning and approach to the two demand letters are instructive:

Reading together the plaintiff's two letters ... we find that plaintiff did sufficiently state the purpose of his inspec-

tion, *i.e.,* the investigation of improper transactions. The corporation appears to admit that this is a proper purpose; at all events we have no doubt about it. It is said that the [first] letter was not in itself sufficiently specific, and that appears to be true. *State ex rel. Miller v. Loft,* 34 Del. 538, 156 A. 170 [ (Super.Ct.Del.1931) ]. But the subsequent letter ... referred to three specific transactions, and although plaintiff did not specifically ask for inspection in respect to any of these matters, yet mention of them tended to show that plaintiff was not merely on a fishing expedition and that he had some specific basis for his demand.

*Id.* at 246 (footnote omitted).

The state supreme court concluded that the trial court had correctly dealt with the shareholder's demand for inspection insofar as the lower court had "(1) construed the pleadings as disclosing as a specific purpose of the examination the subject specified in the order; (2) found such purpose to be proper; and (3) ordered an inspection limited to such purpose." *Id.*

*Nodana* illustrates two points of particular relevance for our purposes. First, the Delaware Supreme Court interpreted the requirement that a shareholder "prove" a proper purpose to mean only that the shareholder must allege specific facts with sufficient particularity to show a proper purpose. Significantly, the Nodana shareholder's first demand letter, alleging unspecified wrongdoing, was held not to meet that standard, but the second letter, referring to particular transactions, did. Second, the state supreme court approved the trial court's circumscribing the scope of inspection. The scope was properly limited, Delaware's High Court held, to those documents relevant to a purpose shown to be proper. In contrast, the shareholder's broadsides of improprieties within Nodana's corridors did not support general access to the company's books and records.

Speaking of Delaware law, a more recent lower court case in Delaware is illustrative of the way in which that State's law has developed with respect to the problem of

determining the scope of the court-mandated inspection. In *Skoglund v. Ormand Industries*, 372 A.2d 204 (Del.Ch.1976), the corporation argued from *Nodana* and other cases that "the right of a shareholder to inspect corporate books and records is limited to those documents relating to the specific matters stated by the shareholder in his demand letter." *Id.* at 210. The Chancery Court disagreed, holding that the precedents established no such inflexible principle. Rather, the court interpreted *Nodana* and subsequent cases to mean that inspection "should be reasonably confined to information concerning the event or circumstances which caused the shareholder to become interested in the first place." *Id.* Since general mismanagement and wrongdoing were alleged—and supported by reference to specific transactions in an eleven-page, single-spaced letter—the plaintiff was granted general access to the corporate records, rather than more limited access to documents concerning the enumerated transactions.

**B**

■ We return now to the case at hand. In our view, this case fits comfortably within the analytical framework erected by *Nodana* and clarified (as to scope) by *Skoglund*. First, as the District Court found, Fleisher met its proper-purpose burden by demanding inspection of corporate books and records in order to "ascertain whether the rates being charged to Builder Members ... are being applied uniformly." J.A. at 195. As we see it, the allegation of discriminatory treatment among members sets forth a proper purpose, reasonably related to the requesters' interests as members. In addition, the allegation is of sufficient specificity to support an inspection within the teaching of *Nodana*. Second, the District Court correctly limited the scope of the inspection to those documents

relevant to the requesters' proper purpose. *See Skoglund, supra*, 372 A.2d at 210.

**1**

Now for the specifics. We address first HWC's cross-appeal, in which it argues that the District Court erred in allowing any inspection at all. HWC asserts that, under Delaware common law, a shareholder may not inspect a corporation's books and records "unless a *prima facie* case can be established by specific factual averments as well as *some* proof of possible wrongdoing." HWC Brief at 31–32. HWC contends that the District Court correctly rejected Fleisher's bare-bones allegations of possible mismanagement and financial weakness as sufficient to support a general inspection, but failed to apply the same analysis to Fleisher's allegations concerning disparate treatment among members. In this regard, HWC complains that "the [District] Court allowed inspection despite finding that no evidence was presented to establish or suggest non-uniformity or discrimination." *Id.* at 16.

■ HWC misreads Delaware law. As we understand the cases, it is the *particularity* of the allegation in the demand letter that serves to assure that the shareholder in fact seeks inspection for a proper purpose. A plaintiff need not prove or allege specific instances of nonuniform treatment; rather, the plaintiff's burden is to show, by sufficiently particular allegations, a proper purpose. In this case, therefore, Fleisher was not required to come forward with proof of disparity in treatment with respect to either premium rates or capital contributions.[7] Neither is there support for HWC's contention that the shareholder must prove *wrongdoing* by the corporation. To be sure, many of the reported cases do involve such circumstances, but there is no requirement that corporate skullduggery be proved before inspection rights become choate.

---

**7.** At a later stage in the proceedings, Fleisher did offer proof, in the form of an affidavit from a former director of HWC, of discriminatory treatment in both fees and capital contributions requirements. *See* Sendelsky Affidavit; J.A. at 315. Fleisher attached the affidavit to its Oppo-

sition to Defendant's Motion to Strike. HWC had filed its Motion to Strike in response to Fleisher's motion for injunctive relief. *See* pp. 1532 *supra*. For reasons stated below, we do not consider the Sendelsky Affidavit.

### 2

For its part, Fleisher attacks the District Court's decision to the extent that, in *Fleisher III*, it limited the scope of inspection previously permitted in *Fleisher II*. All a plaintiff need do, Fleisher contends, is show a proper inspection purpose. Fleisher Reply Brief at 17. Once such a purpose has been established, "all relevant and material books, records, documents and entries" are subject to inspection by the shareholder. Fleisher Brief at 30. On the facts of this case, Fleisher contends, the District Court erred in limiting the scope of inspection because Fleisher established a proper purpose in its demand letter enumerating a number of specific purposes, buttressed by (1) specific reference to the possibility that members were not being assessed rates in a uniform manner, and (2) the recent bankruptcy filing of the Texas builder, NPC, evidencing financial difficulty and mismanagement.

■ Fleisher underreads Delaware law. First, there is no support for its extravagant view that once a proper purpose is shown *everything* falls within the inspection right. As Fleisher itself acknowledges, only documents "relevant" to a proper purpose are subject to court-ordered inspection. The relevancy criterion necessarily implies a limitation on scope. As *Skoglund, supra,* put it, shareholder inspection "should be reasonably confined to information concerning the event or circumstances which caused the shareholder to become interested in the first place." 372 A.2d at 210.

■ In this case, the District Court correctly found that only Fleisher's targeted concern about non-uniform treatment of builders was sufficiently specific to support court-ordered inspection. The other two asserted purposes—to ascertain the financial and operating condition of HWC and to determine whether it is being prudently managed—were too undifferentiated and generalized to support a broader inspection. Allowing a wide-ranging inspection based on these stated purposes, without more, seems to us squarely foreclosed by the Delaware Supreme Court's decision in

*Nodana*. There, again, the state supreme court explicitly rejected as lacking in sufficient specificity the first demand letter by the Nodana shareholder, requesting inspection aimed at investigating "improper transactions." Other, more recent Delaware cases (albeit construing Delaware's statutory right of inspection, *see supra* n. 6) confirm our reading of *Nodana* that the other two purposes advanced by Fleisher are, similarly, too general to support a broadly worded court-ordered inspection. *See e.g., Helmsman Management Services, Inc. v. A & S Consultants, Inc., supra,* 525 A.2d 160 (shareholder's stated purpose to investigate the possibility of mismanagement and waste, while legally valid, insufficient to support broad, general inspection without record support); *State ex rel. Waldman v. Miller–Wohl Co.,* 42 Del. 73, 28 A.2d 148 (1942) (general allegations of possible wrongdoing—specifically, payment of excessive salaries to officers—insufficient to support a broader inspection).

Second, the recent bankruptcy filing of NPC does not fill the gap. As discussed earlier, the Paparome Affidavit, J.A. at 270, which first made reference to the Texas builder's bankruptcy and the "super builder" program, was filed in the District Court only after judgment had been entered. Fleisher made its post-judgment submission (4/3/87) during the pendency of HWC's Rule 59 motion, after *Fleisher II* (10/29/86), but prior to the trial court's handing down *Fleisher III* (7/7/87). Some three weeks after its initial submission, Fleisher submitted more detailed information through the affidavit of Leonard Sendelsky, a former director of HWC. *See* J.A. at 315; *supra* note 7.

In rendering its decision in *Fleisher III*, the trial court did not pass upon Fleisher's then recently filed motion for injunctive relief; indeed, the District Court did not even allude to that rather unorthodox filing. Hence, as the case comes to us, that post-judgment motion (with the pivotal affidavits) was never acted upon. Moreover, in the wake of *Fleisher III*, Fleisher took no further action in the District Court to secure resolution of its pending motion,

presumably because, in practical effect, its request for access to the corporate books and records was finally resolved (although not entirely to Fleisher's liking) in the context of the Rule 59 disposition. In any event, Fleisher chose to file a notice of appeal and bring this case to the Court of Appeals, with the motion (and attached affidavits) left entirely unresolved in the trial court.

Under these particular circumstances, we do not think it appropriate for us to consider the post-judgment affidavits. For one thing, Fleisher's effort to introduce this new evidence was the subject of a motion to strike by HWC which, like the motion for injunctive relief itself, was never acted upon. For another, Fleisher, for whatever reason, chose to litigate the issues in this case on appeal from the order in *Fleisher III*, without the District Court's ever having addressed the admissibility and significance of the post-judgment affidavits. The proper vehicle for Fleisher's effort in this respect would have been that employed by HWC, namely a post-judgment motion filed pursuant to the Federal Rules. Those Rules set forth the well-established mechanisms for securing modification and amendment of judgments or relief from them. At this stage, we are not only without the benefit of the District Court's resolution, but we are also faced with Fleisher's effort to litigate on appeal that which was more properly the subject of litigation before the trial court in the form of a post-judgment motion.[8]

## III

We turn, finally, to Fleisher's contention that the District Court erred in dismissing Count IV of Fleisher's complaint, alleging a violation of the anti-fraud provision of the Securities Exchange Act of 1934, section 10, 15 U.S.C. § 78j (1982).

To recap: Fleisher alleged that HWC misled members into believing that all members would pay a $25 per home capital contribution when in fact larger builder-members paid substantially less. Avoiding the "thorny" issue whether the capital contributions qualified as an "ownership interest" within the meaning of PLRRA, the District Court held that the documents submitted by Fleisher—namely, the HWC pamphlets—"put plaintiffs on notice that not every builder would be charged the same enrollment fee." Slip op. at 13; J.A. at 187. This was so, the District Court reasoned, because the pamphlets themselves stated that a member's capital contribution will "not to exceed $25." *See supra* p. 1531.

Fleisher attacks the District Court's determination on the basis that HWC's statement was at best cryptic, and therefore potentially misleading, and that HWC had an affirmative duty to disclose the discrepancy. *If* we assume that these capital contributions are ownership interests, and should therefore be treated as securities, then nondisclosure of the fact of a disparity in price to various shareholders might be argued to be materially misleading. If the

---

8. Our decision, however, by no means forecloses Fleisher from taking whatever action, if any, may appropriately be left open to it in the trial court or, if no further avenue for relief in that forum now exists in the context of this case, from submitting a new inspection request based on the more recently obtained information.

One minor item remains in respect of the inspection question: Fleisher asks us to modify the District Court's order to include inspection of HWC's wholly owned subsidiaries, HOW and HOWIC. *See* Fleisher Brief at 38. The District Court's order accompanying *Fleisher III* mandated inspection confined to "only ... the books and records of HWC [*i.e.*, Home Warranty Corporation] relevant and essential to determining whether the rates being charged to builder-members are uniform or discriminatory." 670

F.Supp. at 33. Fleisher contends that the District Court intended its order to include the books and records of HOW and HOWIC. We agree. The District Court's order in *Fleisher II* permitted inspection of "the books and records of Home Warranty Corporation, *and its aforesaid wholly owned subsidiaries.*" 647 F.Supp. at 671 (emphasis added). *Fleisher III* left in effect the District Court's order in *Fleisher II* to the extent not modified by *Fleisher III.* The opinion accompanying the District Court's order in *Fleisher III* did not set forth any reasons to limit inspection solely to HWC, and we therefore do not read the District Court's reference to HWC alone in the latter order as intended to limit inspection to the parent company's records. Indeed, HWC does not appear to challenge this point.

"ownership interest" and materiality elements are otherwise satisfied, then the statement that the required contributions would not exceed $25 would not, we believe, reasonably put an investor on notice that disparate prices would be charged to members of the mutual. But this sort of fact-laden legal issue cannot appropriately be resolved at this fact-bare stage of the litigation.

We are, in short, unable to proceed further, namely to decide on the record before us whether Fleisher's securities count should have been dismissed, at least at this stage of the proceedings. The parties have not favored us with detailed argument either on the meaning of "ownership interest" as used in the PLRRA or on other elements, such as materiality, necessary to make out a *prima facie* violation under the Act. Moreover, Fleisher suggested in the proceedings below that further factfinding might be necessary in order properly to consider the meaning of "ownership interests" within the context of the capital structure of HWC. *Memorandum in Reply to Defendant's Opposition to Plaintiffs' Motion to Amend and in Reply to Defendants' Memorandum Seeking Dismissal of Additional Plaintiffs* at 27. Finally, there seems to have been some confusion below with respect to the specific securities provision upon which plaintiffs intended to rely. *See supra* n. 4.

Under these circumstances, the most appropriate course, we believe, is to remand to the District Court for reconsideration of defendants' motion to dismiss the securities law claim. The court should first determine whether the contributions are indeed "ownership interests," and then, if they are, whether the nondisclosure of disparate levels of contribution ran afoul of the specific anti-fraud provision (§ 10(b)) invoked by Fleisher. Accordingly, we vacate that portion of *Fleisher I* dismissing Count IV of Fleisher's amended complaint and remand to the District Court for further proceedings.

JUDGMENT ACCORDINGLY.