In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2293

William Kinslow,

Plaintiff-Appellee,

v.

American Postal Workers Union,
Chicago Local,

Defendant-Appellant.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 92 C 4120--Milton I. Shadur, Judge.


Argued February 11, 2000--Decided August 2, 2000




Before Posner, Manion and Kanne, Circuit Judges.

Manion, Circuit Judge. The late Tommy Briscoe used his presidency of the Chicago Local of the American Postal Workers Union to facilitate several different criminal schemes, including the embezzlement of Union funds. For obvious reasons, Briscoe and the Union secretary Elizabeth Bell didn't take kindly to Union member William Kinslow's persistent complaints and inquiries about Union finances. When Kinslow went so far as to request access to the Union's financial records and to sue the Union, it retaliated by expelling him. Kinslow sued Briscoe, Bell, and the Union under the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"). After a bench trial, Kinslow prevailed on his retaliation and access to financial records claims. He was awarded overtime pay, punitive damages, attorney's fees, and injunctive relief. The Union appeals, raising numerous arguments. Only its argument concerning overtime pay might have merit, so we vacate the award of overtime pay and remand the case for more specific findings on this claim. We affirm in all other respects.

I.

Tommy Briscoe was first elected president of the 4,000-member Chicago Local of the American Postal

Workers Union in 1982. He soon began using his office for criminal schemes and was eventually indicted for embezzling Union funds. One of his partners in crime was codefendant Elizabeth Bell, who served as the Union's secretary and treasurer from 1981 until 1992. Briscoe was eventually convicted on fourteen counts, including charges of making illegal loans, destruction of financial records, mail and wire fraud, income tax evasion, and theft and embezzlement of union funds. United States v. Briscoe, 65 F.3d 576, 582 (7th Cir. 1995)./1 For her part, Bell pleaded guilty to aiding and abetting Briscoe in obtaining illegal loans from the Union. Because the present case was suspended due to Briscoe's criminal case, by the time it went to trial, Briscoe had died.

William Kinslow was a member of the Union since 1971. During the early part of the Briscoe administration, Kinslow served as executive vice president of the Local, during which time he began to suspect that something was amiss with Briscoe's use of Union funds. On many occasions he accused Briscoe and Bell of financial improprieties, such as using Union funds to lease Briscoe's car, bouncing checks drawn on Union accounts, and illegally "borrowing" funds from the Union. In October 1991, after Briscoe and Bell were indicted for their crimes, Kinslow requested from Bell copies of the Union's financial records, as was his right under federal law. For reasons that are now obvious, Bell ignored his requests.

Various Union leaders became fed up with Kinslow and began to retaliate against him. Several Union stewards refused to file grievances on Kinslow's behalf regarding the Postal Service's refusal to assign Kinslow overtime work. In an apparent effort to silence Kinslow or at least to make his charges seem incredible, the stewards threatened Kinslow and disparaged him to other Union members. In response, Kinslow submitted repeated complaints to Briscoe and the national Union about the objectionable treatment. These complaints were essentially ignored. The final straw came in July 1992, when Kinslow sent a letter to the Local's executive board outlining Briscoe's pattern of conduct and reminding the board of Briscoe's indictment. When Briscoe learned of the letter, he invited Kinslow to attend a board meeting to present his case. Kinslow declined, not only because of his claimed fear of bodily injury, but also because he recognized the futility of attending a Briscoe-led meeting. He did, however, urge the board to conduct its own investigation of Briscoe. Instead, the board charged Kinslow with engaging "in conduct that would expose the Union to civil liability," meaning his filing of this suit.

Ironically, it is this charge that set in motion the events which would contribute to the Union's civil liability in this case. Although the accusation was out of line, in October 1992 the Union members voted unanimously to expel Kinslow. This gave Kinslow the distinction of being the only member expelled from the Union in at least twenty years. Undeterred, Kinslow appealed his expulsion to the national Union, but as usual he received no response.

Kinslow's suit was brought pursuant to the LMRDA, which was enacted to ensure that unions and their officials "adhere to the highest standards of responsibility and ethical conduct." 29 U.S.C. sec. 401(a). After the expulsion, Kinslow amended his complaint to allege that the Union retaliated against him for bringing the suit and for exercising his right to protest unethical conduct, and that the Union refused him access to the financial records. 29 U.S.C. sec.sec. 411(a)(2), 411(a)(4), 431(c). Because much of the evidence was undisputed, the district court needed only a three-day bench trial to find for Kinslow on all claims. The court granted equitable relief in the form of Kinslow's reinstatement and an injunction against further retaliation. It also awarded $40,000 for overtime wages that Kinslow lost because the Union failed to file grievances on his behalf, $1 for his loss of his LMRDA free speech rights, $150,000 in punitive damages, and attorneys' fees. Although Briscoe and Bell were also defendants, Briscoe died on the eve of trial and Bell is presumably judgment-proof, which explains why only the Union appeals.

II.
A.   Examination of Union Financial Records

The Union presents a series of arguments asserting that the district court erred in finding that the Union violated Section 431 of the LMRDA by refusing Kinslow access to the Union's financial records. To understand the Union's arguments, a little background concerning the LMRDA is necessary.

After determining that some union leaders were running their organizations primarily for their own benefit, Congress enacted the Labor Management Reporting and Disclosure Act of 1959, in part to curb embezzlement and other unlawful activities. Finnegan v. Leu, 456 U.S. 431, 434 (1982); Mallick v. International Bhd. of Elec. Workers, 749 F.2d 771, 776 (D.C. Cir. 1984). Among other things, the LMRDA requires unions to file annual financial reports with the Secretary of Labor--known as LM-2 reports--detailing the

union's assets, liabilities, and disbursements. 29 U.S.C. sec. 431(b). Because union members are often in the best position to discover union corruption and have a vested interest in honest union leaders, the Act also requires unions to make available to their members those records which purportedly corroborate the LM-2 reports. 29 U.S.C. sec. 431(c); Conley v. United Steelworkers of Am., Local Union No. 1014, 549 F.2d 1122, 1123 (7th Cir. 1977). The provision is designed "to make full information related to the financial affairs of unions available to members in order that they would be 'strengthened in their efforts to rid themselves of untrustworthy or corrupt officers.'" Conley, 549 F.2d at 1124 (quoting Antal v. District 5, United Mine Workers of Am., 451 F.2d 1187, 1189 (3d Cir. 1971)). But access to these reports is not unfettered. Believing that some union members might harass union officials with repeated requests for documents, the LMRDA only requires the production of financial records when the request is based on good cause. Specifically, the LMRDA states:

Every labor organization required to submit a report under this subchapter shall make available the information required to be contained in such report to all of its members, and every such labor organization and its officers shall be under a duty . . . to permit such member for just cause to examine any books, records, and accounts necessary to verify such report.

29 U.S.C. sec. 431(c) (emphasis added). Thus, in pursuing judicial enforcement of this right, the plaintiff has the burden of showing that he has just cause for seeking the information and that his request is not simply based on idle curiosity. Mallick, 749 F.2d at 784.

In attacking the district court's findings on this claim, the Union first argues that Kinslow had no just cause to see the Union's financial records. Many courts have noted that the "standard for determining whether there was just cause is necessarily minimal. Just cause need not be shown beyond a reasonable doubt, nor by a preponderance of the evidence. It need not be enough to convince a reasonable man that some wrong has been done . . . ." Fruit and Vegetable Packers and Warehousemen Local 760 v. Morley, 378 F.2d 738, 744 (9th Cir. 1967); see Landry v. Sabine Indep. Seamen's Ass'n, 623 F.2d 347, 349 (5th Cir. 1980). Indeed, a union member need not even suspect an impropriety, although a reasonably-based suspicion would certainly constitute just cause. The just cause requirement simply entails a showing that the union member had some reasonable basis to question the accuracy of the LM-2 or the documents on which it

was based, or that information in the LM-2 has inspired reasonable questions about the way union funds were handled. Mallick, 749 F.2d at 781 ("Typically, union members will be interested in looking at underlying records precisely because they believe the LM-2 reports are accurate, and raise questions about the handling of union funds.")./2

In this case, at the time Kinslow initially requested the records, Briscoe and Bell had already been indicted for embezzlement and for issuing improper loans with union funds. The existence of the indictment indicates that an impartial grand jury believed that crimes relating to union disbursement of funds probably occurred. Clearly the indictment gave Kinslow a rational basis for his suspicions and a good reason to inspect the Union's financial records. Because just cause under the LMRDA requires less than a reasonable suspicion of wrongdoing, and an indictment's indication of probable cause easily surpasses the requisite showing, an indictment for financial improprieties within the Union certainly satisfies the just cause requirement. Only a criminal conviction for embezzlement, which requires proof beyond a reasonable doubt, could provide a stronger basis for good cause. Incidentally, even after Briscoe was convicted and Bell pleaded guilty, the Union continued to refuse to provide Kinslow with the requested documents. Because either the indictment or the convictions would instill in any reasonable person a level of skepticism surpassing reasonable suspicion, the Union's argument that Kinslow lacked just cause is patently frivolous.

Its next argument isn't much better. The Union contends that it had no duty to turn over the financial records to Kinslow because at the time he requested the documents he didn't state his reason for seeking them. Notably, the text of Section 431 seems to require the plaintiff to show at trial that he had good cause to examine the books. It doesn't explicitly require that the union member inform the union of the reasonable basis for his inquiry. The "notice of reasons" requirement to which the Union points is a judicial addition which apparently is based on a hope that once the union learns of the member's good cause, it will comply with its duty to turn over documents without requiring the member to resort to litigation. Morley, 378 F.2d at 743. This reasoning may have some logic to it, but it also has obvious limitations. It seems likely that corrupt union officials would be more reluctant to produce incriminating documents once they know that suspicion is converging on them. At that point, they have little to gain by handing over incriminating documents, and much to

lose, specifically because they know that there is good cause for suspicion. Thus, contrary to the rationale underlying this rule, notice of good cause might make unions less inclined to cooperate.

We also note that in Morley, the case from which this requirement originated, the Ninth Circuit acknowledged that there is no specific statutory requirement of prior notice, and whatever right there was to notice was waived in that case. Furthermore, the D.C. Circuit case cited by Morley in support of the existence of this notice requirement in fact never adopted such a rule. See International Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am. v. Wirtz, 346 F.2d 827, 832 (D.C. Cir. 1965) (assuming without deciding that the member must give notice to the Union of his just cause at the time the document request is made). Although we too previously derived from legislative history the assumption that this requirement is legitimate, see Conley, 549 F.2d at 1124, it seems that even if the rationale underlying the policy were sound, the desire to encourage the settlement of the claim without litigation is hardly a sufficient basis for whittling away a union member's statutory rights. This is especially so when we consider that the notice prerequisite cuts against the statute's goal of permitting timely access to union financial records in order to prevent corruption. But we need not further address this issue today because even those courts that have added this condition recognize three separate exceptions, any one of which is applicable here. Specifically, a union member seeking union financial records need not inform the union of his basis for suspecting financial improprieties when the basis for his suspicions should be known to the union, when the union waives this notice requirement by failing to ask for his reasons, or when a reasonable union member would believe that providing such notice would be futile. Morley, 378 F.2d at 743; cf., Bagsby v. Lewis Bros. Inc. of Tenn., 820 F.2d 799, 805 (6th Cir. 1987) (Ryan, J., concurring); Retana v. Apartment, Motel, Hotel and Elevator Operators Union, Local No. 14, AFL-CIO, 453 F.2d 1018, 1027 (9th Cir. 1972).

Here, Briscoe and Bell's indictment for embezzlement was well known among the union leadership, and so Kinslow's reason for seeking the records should have been obvious to the Union as well. Because the Union had notice of Kinslow's just cause for desiring to examine the documents, Kinslow was not obliged to inform the Union of his obvious reasons. Furthermore, even if there had been no indictment, Kinslow would still be exempted from any duty of prior notice

because Briscoe's criminal exploits were so well known within the union that any reasonable members should have suspected that criminal conduct was afoot. See Briscoe, 65 F.3d at 580 (describing Briscoe's exploits, including testimony that he openly destroyed union records and instructed the Union's administrative staff to collect loan application fees only in cash). As a second independent ground for excusing actual notice, the Union waived any right to notice by failing to ask Kinslow about his reasons for requesting the documents. Instead of attempting to find out what prompted Kinslow's demand, the Union simply ignored his requests. In a nearly identical case, the Ninth Circuit held that this constitutes waiver. It stated:

Here the members presented a written demand to inspect the records. The union's answer was to ignore the demand. Had it wished to exercise its right to have a showing of just cause, the union should have asked the demanding members to allege such cause. To completely ignore the members' demand is inconsistent with the purpose of the union's rights to first consider the just cause allegation. To ignore the members' demand is a reflection of the union officers' attitude that they are unconcerned with the demand, whether or not it is supported by just cause.

Morley, 378 F.2d at 743. The Postal Workers Union displayed the same attitude in refusing to respond to Kinslow's demands, so any right it had to notice was waived. This attitude lends support to a third independent reason to excuse notice: futility. The Union's repeated acts of disdain for Kinslow's rights would lead a reasonable person to believe that even if Kinslow set forth a detailed list of his reasons for suspecting illegal conduct, the Union would still have refused to produce the documents. Section 431 doesn't require a union member to perform futile acts in order to vindicate his rights. Accordingly, Kinslow was under no obligation to provide the Union with a detailed list of his concerns when this would most likely prove fruitless.

  The Union next argues that Kinslow didn't specifically identify the documents he wanted. We have already discussed the hollowness of this argument in the context of the Jencks Act; it is impossible for a person requesting documents he has never seen to describe them with great detail. United States v. Johnson, 200 F.3d 529, 534 (7th Cir. 2000); United States v. Allen, 798 F.2d 985, 997 (7th Cir. 1986). In recognition of this fact, the LMRDA, like the Jencks Act, does not require great precision in crafting requests. Rather, we perceive the statute to require only

minimal specificity. Here, Kinslow requested "full financial disclosure of our Local's Financial business including copies of the General Account, Payroll Account and also the full minutes of both the Executive Board and General meeting minutes. For months beginning May 1990 to September 1991." This request was sufficiently specific to apprise the Union of what Kinslow desired. Moreover, to the extent it was imprecise or overly broad, the Union waived any objection by failing to ask Kinslow for more precision, as we discussed above with respect to notice of just cause. Accordingly, we reject the Union's lack of specificity argument.

The Union's last argument concerning Kinslow's access claim is that it was impossible to comply with his request because either the Departments of Labor or Justice had the relevant documents. This argument seems specious in light of its late introduction into the case and the Union's contention that it couldn't even tell what documents Kinslow wanted. If it didn't know what documents Kinslow was requesting, it is unlikely that it could know that it didn't have them. This apparent inconsistency might be reconcilable if the government had seized all of the Union's financial documents and the Union kept no copies, but the record indicates otherwise. Regardless, there is sufficient evidence in the record to support the district court's implicit finding that the Union had the documents, so we cannot say that the district court erred in granting relief on this claim.

B. Overtime Pay

The Union next attacks the district court's award of $40,000 for Kinslow's lost overtime with essentially three arguments. First, the Union contends that the award is barred by the statute of limitations, but as the district court noted, the Union waived its statute of limitations argument by failing to develop it before the district court. Its second argument is that the award was the result of the district court's prejudice against the Union, but because this argument is undeveloped on appeal, it too is waived. Kelly v. United States E.P.A., 203 F.3d 519, 522 (7th Cir. 2000). This leaves only the Union's argument that it cannot be held liable for the lost overtime because only the Postal Service could award overtime. For his part, Kinslow concedes that only the Postal Service awards overtime, but he maintains that the Union is also responsible for its retaliatory failure to grieve his complaint to the Postal Service.

Although Kinslow's claim is for retaliation based on the exercise of his LMRDA free speech

rights, it is a hybrid claim in the sense that the harm Kinslow suffered stemmed from both his employer's denial of overtime and the Union's failure to grieve the wrong. Such claims are usually brought against the Union in suits for breach of the duty of fair representation and against the employer for breach of the collective bargaining agreement. See 29 U.S.C. sec. 185(b); Christiansen v. APV Crepaco Inc., 178 F.3d 910, 913 n.2 (7th Cir. 1999) (hybrid cases entail an employer's breach of the CBA and the union's breach of its duties to grieve the wrong committed by the employer); Demars v. General Dynamics Corp., 779 F.2d 95, 97 (1st Cir. 1985). Even though no claim was brought against the Postal Service, in hybrid cases the district court is required to assign responsibility to both the union and the employer according to which party is most culpable for the specific facets of harm suffered by the plaintiff. The key in such suits is "to apportion liability between the employer and the union according to the damage caused by the fault of each," so that the union does not have to pay the employer's share of the damages, and vice-versa. Vaca v. Sipes, 386 U.S. 171, 197 (1967); Seymour v. Olin Corp., 666 F.3d 202, 213 (5th Cir. 1982). For purposes of apportioning responsibility, the fact that Kinslow is suing for retaliation as opposed to breach of the duty of representation is of no moment, as the general principles applicable to breach of the duty of fair representation cases apply equally to retaliation cases.

In Bowen v. United States Postal Service, the Supreme Court reviewed a district court's apportionment of damages in a hybrid case arising out of a postal employee's wrongful termination and the union's wrongful failure to grieve his complaint. 459 U.S. 212, 214 (1983). Because both the union and the Postal Service shared responsibility for the employee's lost wages, the Court apportioned damages according to a temporal framework. Thus, as the employer was responsible for the employee's discharge, the Court held that the Postal Service was liable for all the pay the employee would have earned prior to the time he would have been reinstated had the union properly pursued his case. But because the employee probably would have been reinstated had the union promptly sought redress, the Court thought that it would be "unjust to require the employer to bear the increase in the damages caused by the union's wrongful conduct." Therefore, it held that only the union was liable for the wages the employee would have earned after he would have been reinstated had the union fairly represented him. 459 U.S. at 223; see Cruz v. Local Union Number 3 of the Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1158 (2d Cir. 1994); Aguinaga v.

United Food and Commercial Workers Int'l Union, 993 F.2d 1463, 1475 (10th Cir. 1993); Niro v. Fearn Int'l, Inc., 827 F.2d 173, 179 (7th Cir. 1987).

In our case, Kinslow's lost opportunity to work overtime is initially traceable to the Postal Service's breach of the CBA through its failure to assign him overtime. So the Postal Service's responsibility begins with the time it first breached the CBA, and had Kinslow also sued the Postal Service, it would have been responsible for the damages accruing from the initial lost opportunity to work overtime. As far as the Union's responsibility for Kinslow's predicament, he does not allege that the Union affirmatively caused the Postal Service to breach the agreement, which would be the only basis for assigning responsibility to the Union for the breach. Instead, Kinslow only claims that the Union failed to rectify the breach by refusing to file a grievance on his behalf. So the Union cannot be held responsible for any overtime Kinslow lost prior to the date Kinslow would have been reinstated if it had processed his complaints. The Union is liable, however, for the lost overtime which occurred after it should have sought a remedy for the Postal Services's breach of the CBA. Thus, we reject the Union's argument to the contrary.

All that is left is to determine what portion, if any, of the $40,000 awarded is derived from overtime Kinslow lost prior to the date he would have obtained overtime work had the Union not retaliated against him; that is, what portion of the award is attributable to the Postal Service rather than the Union. We cannot make this determination on the present record, however, because the district court made no specific findings as to the date the Union should have filed a grievance, and the date the grievance should reasonably have resolved Kinslow's dilemma. Thus, we cannot say whether the award of overtime pay accurately reflects that portion of harm for which the Union is responsible, although the record seems to indicate otherwise. Therefore, we must vacate the award and remand the case to the district court so that it might reconsider its award and enter further findings. Such findings should include the date Kinslow was first denied overtime, the date Kinslow first complained about his plight, the date he would have been allowed to work overtime had the Union grieved his complaint, the amount of overtime he likely would have worked, and the amount of compensation he would have received per hour of overtime. Of course, the district court may exercise its discretion to reopen the record and receive additional evidence on these points.

Although we do not retain jurisdiction over this case, any disagreement with the district court's subsequent award could be addressed in a separate, successive appeal, which would be heard by this panel.

C. Punitive Damages

The Union also challenges the award of $150,000 in punitive damages, asserting among other things that its conduct was not sufficiently egregious to warrant punitive damages./3

The LMRDA does not specifically permit or preclude punitive damages. But because all union members' rights are threatened when one member's rights are violated, courts have held that the LMRDA implicitly authorizes the award of punitive damages to deter malicious violations of the Act. Maddalone v. Local 17, United Bhd. of Carpenter and Joiners of Am., 152 F.3d 178, 186 (2d Cir. 1998); Woods v. Graphic Communications, 925 F.2d 1195, 1205 (9th Cir. 1991); Doty v. Sewall, 908 F.2d 1053, 1062 (1st Cir. 1990). Punitive damages are awarded in LMRDA cases only where the union has acted with ill will or reckless disregard for the plaintiff's interests. Thompson v. Office and Professional Employees Int'l Union, AFL-CIO, 74 F.3d 1492, 1508-09 (6th Cir. 1996). Thus, to merit such an award, the plaintiff must show that: (1) in retaliating against the plaintiff, the union acted willfully or with reckless disregard for the plaintiff's interests; and (2) the conduct of the union was egregious or the harm it inflicted was severe. Woods, 925 F.3d at 1206; Schmid v. United Bhd. of Carpenters and Joiners of Am., 827 F.2d 384, 386 (8th Cir. 1987) (per curiam); Bise v. International Bhd. of Elec. Workers, AFL-CIO Local 1969, 618 F.2d 1299, 1306 (9th Cir. 1979). Because we believe this approach is in accordance with the policies and goals of the LMRDA, we apply this test to the present case.

Despite the Union's protestations to the contrary, the record is replete with instances of egregious conduct manifesting a specific intent to harm Kinslow in retaliation for voicing his concerns about corruption. The Union tries to distance itself from president Briscoe, but a Union can only act through its agents, and the actions and intentions of the Local president would usually be imputable to the Local. Regardless, it wasn't just Briscoe who retaliated; the Union stewards were also involved, as they refused to grieve Kinslow's complaints about overtime. And although Kinslow wasn't required to show that the rank and file members specifically approved their officers' misdeeds in order to merit punitive damages, the

record indicates that the Union members ratified Briscoe's heavy-handed tactics by voting unanimously to expel Kinslow from the Union. Even after Briscoe was incarcerated and a new president installed, the Union made no attempt to reinstate Kinslow, and in fact thwarted such efforts. See Howard v. Weathers, 139 F.3d 553, 555 (7th Cir. 1998) (describing the Union's refusal to even consider reinstatement). As the district court acknowledged, the Union leadership has "done absolutely nothing to make things right with Kinslow. To the contrary, the Union not only stubbornly continued to defend this case (as was its right) but sought to do so on wholly untenable grounds (as was not its right)." In light of the Union's malicious intent, the seriousness of its conduct, and the need to deter similar acts, the Union's arguments about punitive damages are also untenable. In short, when faced with conduct this outrageous, we cannot say that the district court erred in awarding substantial punitive damages.

D.  Attorneys' Fees

   Finally, the Union argues that the district court erred in awarding attorneys' fees.

   The district court awarded attorneys' fees for both Kinslow's Section 431 access to financial records claim and his Section 411 retaliation claim. Section 431 specifically authorizes attorneys' fees, and the Union apparently doesn't challenge the award of fees on this claim. 29 U.S.C. sec. 431(c); see generally Stomper v. Amalgamated Transit Union, Local 241, 27 F.3d 316 (7th Cir. 1994). As to the Section 411 claim, although the LMRDA does not specifically authorize counsel fees, the Supreme Court has held that courts may exercise their inherent equitable power to award attorneys' fees in such cases. Hall v. Cole, 412 U.S. 1, 4-5 (1973); see Stomper, 27 F.3d at 319. In Hall, the plaintiff was a union member whose union violated the LMRDA by expelling him in retaliation for criticizing union policies. He prevailed at trial and was awarded attorneys' fees, which the union challenged. The Court found two bases for upholding the award. First, under a punitive theory, it held that attorneys' fees were awardable to punish the union for its malicious conduct. Second, under a common benefit theory, because the plaintiff's suit benefitted all of the union's members, the Court believed that fairness dictated that all of the union members should share the costs of the common benefit. Hall, 412 U.S. at 5; see Murray v. Laborer's Union Local No. 324, 55 F.3d 1445, 1453 (9th Cir. 1995). It therefore affirmed the award of counsel fees.

The district court in the present case similarly believed that attorneys' fees were warranted under either of these rationales. As we have already discussed the need to punish the Union, we will not address that issue again here. It is sufficient to note that the Union's misdeeds, which were only corrected through this suit, were sufficiently egregious to warrant both punitive damages and attorneys' fees. Although this rationale alone justifies the attorneys' fees, the common benefit rationale is also relevant. As to that theory, the Supreme Court in Hall aptly described the benefit that a retaliation plaintiff bestows upon his fellow union members in pursuing his claim:

[T]here can be no doubt that, by vindicating his own right of free speech guaranteed by sec. 101(a)(2) of Title I of the LMRDA, respondent necessarily rendered a substantial service to his union as an institution and to all of its members. When a union member is disciplined for the exercise of any of the rights protected by Title I, the rights of all members of the union are threatened. And, by vindicating his own right, the successful litigant dispels the "chill" cast upon the rights of others. Indeed, to the extent that such lawsuits contribute to the preservation of union democracy, they frequently prove beneficial "not only in the immediate impact of the results achieved but in their implications for the future conduct of the union's affairs."

Hall, 412 U.S. at 8 (quoting Yablonski v. United Mine Workers of Am., 466 F.2d 424, 431 (1972)). Kinslow's tenacity in pursuing his claims assisted his fellow Union members by sending a clear message to Briscoe's comrades who remained in Union leadership positions that the violation of free speech rights will not go unpunished. By vindicating his own rights, Kinslow's suit warns Union officials not to violate the LMRDA rights of other Union members and provides a fine example of the punishment that corruption will elicit. Furthermore, Kinslow's suit was, in part, the catalyst for the investigation of Briscoe and his eventual conviction. This, in turn, forced his resignation from the Union, which in itself was a benefit to honest members of the Union. Accordingly, whether the district court's award of attorneys' fees is based on a punitive or common benefit theory, it did not abuse its discretion.

III.

The district court's decision to award punitive damages, injunctive relief, and attorneys' fees

is AFFIRMED in all respects. But we VACATE the award of overtime pay and REMAND this portion of the case to the district court for the purpose of entering more specific findings and any further proceedings consistent with this opinion.

/1 The Secretary of Labor also investigated Briscoe, Bell, and the Union for conducting fraudulent elections. See Brock v. American Postal Workers Union, AFL-CIO, Chicago Local, 815 F.2d 466 (7th Cir. 1987).

/2 The Fifth Circuit has defined "just cause" as "circumstances that would put a reasonable union member on notice that further investigation is warranted to assure that the union's LM filings with the Secretary of Labor (required under sec. 431) comport with the union's own records of its activities." Fernandez-Montes v. Allied Pilots Ass'n, 987 F.2d 278, 285 (5th Cir. 1993). While a belief that the LM-2 might be inaccurate would certainly constitute "just cause" for examination of the union's books, we fear that the Fernandez-Montes's formulation of this concept might lead parties to believe that the right of access is limited to only instances where union members seek to verify figures in the LM-2. A verification rationale is too narrow because it "reduces the right of examination to a check on the union's arithmetic." Mallick, 749 F.2d at 781. Because the Fifth Circuit's formulation is not clear on this point, we want to explicitly state our agreement with the D.C. Circuit that "just cause" encompasses more than just a desire to confirm the information on the LM-2 statement.

/3 The Union makes no argument that the award was excessive in relation to the amount of compensatory damages awarded.