Henry V. **KROKOSKY, Jr.,** Plaintiff,

v.

**UNITED STAFF UNION,** Defendant.

No. 03–C–0078–C.

United States District Court,
W.D. Wisconsin.

Sept. 30, 2003.

Roger W. Palek, Neenah, WI, for Plaintiff.

Frederick Perillo, Previant, Goldberg & Uelmen, Milwaukee, WI, for Defendant.

## OPINION and ORDER

CRABB, District Judge.

This is a civil action for injunctive relief in which plaintiff Henry Krokosky, Jr. contends that defendant United Staff Union violated the Labor–Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 401–531, and § 431 in particular, when it refused to disclose an itemized billing statement it paid in July 2002 for legal services rendered by Nola Cross. Section 431(c) provides that a union must disclose certain documents needed to verify the annual financial disclosure reports it files with the Secretary of Labor to its members if they show they have "just cause" to see the document. Jurisdiction is present under 28 U.S.C. § 1331 and 29 U.S.C. § 431(c). Venue is proper because defendant maintains its principal office in Onalaska, Wisconsin. 29 U.S.C. § 431(c).

Both parties have moved for summary judgment. Plaintiff contends that he had just cause to see Cross's itemized bill under the Labor–Management Reporting and Disclosure Act because there is a significant disparity in professional fee expenditures reported on defendant's financial disclosure reports between two successive years. Alternatively, plaintiff contends that he has just cause because defendant's board of directors failed to follow proper procedures in hiring and paying Cross to investigate an employment dispute be-

tween plaintiff and a co-worker. Defendant maintains that plaintiff has not shown just cause because his reasons for wanting to see the bill are pretextual and do not relate to the financial disclosure reports. Because plaintiff has not shown "just cause" to see the bill pursuant to 29 U.S.C. § 431(c), defendant's motion for summary judgment will be granted and plaintiff's motion will be denied.

From the parties' proposed findings of facts, I find that the following facts are both material and undisputed.

## UNDISPUTED FACTS

Defendant United Staff Union is a membership association and labor union incorporated in the state of Wisconsin. Plaintiff Henry V. Krokosky and Debra Armitage are both dues-paying members of defendant in good standing, but each are members of different caucuses within defendant. Both work for the Wisconsin Education Association Council—Fox Valley.

In April 2001, Armitage filed a sexual harassment complaint against plaintiff and Roger Palek, another co-worker. John Carl Davis, who was defendant's president at the time, and Anne Boley, who was then defendant's vice president and grievance chair, agreed that the most appropriate way to respond to Armitage's complaint would be to hire outside counsel to investigate. They hired Nola Cross, a lawyer who was providing unrelated legal services for defendant. Cross performed legal work relating to Armitage's claim between April 2001 and April 2002 that led plaintiff's employer to issue a warning letter to plaintiff, Palek and Armitage.

Cross did not bill defendant for any of her services relating to the Armitage claim until either May or June of 2002. The bill she finally submitted included $12,906.61 in legal fees, of which $6,300 was for services relating to Armitage's claim. Davis ap-

proved payment of the bill in June 2002. Neither Boley nor Davis notified the board of directors that legal fees relating to Armitage's claim had been accruing until a board of directors meeting in September 2002. At that meeting, defendant's treasurer, Debrah Byers, informed the board that Cross's bill had been paid. No board member questioned the bill or otherwise objected.

Defendant has a policy that provides that any member may get information about defendant's expenditures, specifically "amount paid, to whom, for what, amounts spent/remaining in budgetary categories etc.," upon a written request to the treasurer. Plaintiff made a demand to see Cross's bill on December 2, 2002. Defendant has refused to provide an actual copy of the bill under this policy. However, it has informed those members who have requested a copy, including plaintiff, that it paid the $12,906.61 to Cross in July 2002 for work performed between April 6, 2001 and April 16, 2002. Byers also informed plaintiff that he was not entitled to see the Cross bill unless he could show just cause pursuant to the Labor–Management Reporting and Disclosure Act. Plaintiff has made three additional demands to see the bill. In response, defendant has repeatedly informed plaintiff that it will not produce the bill without a showing of just cause.

Plaintiff was not the only union member who demanded to see the bill during this time. On December 13, 2002, Palek sent an email to Byers regarding plaintiff's earlier demand. Byers responded to both Palek and plaintiff three days later by again requesting a just cause showing. Palek responded to Byers, stating: "[O]fficers have a fiduciary responsibility that [union dues] are only spent in [an] appropriate manner. I have asked Anne [Boley] for an explanation of why attorney's fees

were paid for Ms. Armitage. She has not provided an explanation." Byers and Palek exchanged more emails in which Byers characterized Palek's reasons as "rhetoric on why I should not deny the request" and Palek reiterated his concern that "money could have possibly been inappropriately paid out."

Defendant reported on its financial disclosure report for its 2000–01 fiscal year that $6,974 had been expended for professional services; it reported $15,307 on its 2001–02 report, which includes the entire $12,906.61 payment to Cross. Plaintiff has not requested any documentation of the $15,307 professional fee expenditures reported on the 2001–02 report other than the $12,906 Cross bill.

Defendant's by-laws require that any expenses exceeding budgeted amounts must be approved by the board of directors and that "the general membership [must] be notified of the amount and rationale for such authorization." Defendant's proposed annual budget for 2002–03 shows that it budgeted $10,000 per year for legal services for the two fiscal years (2000–01, 2001–02) in which Cross performed legal work relating to Armitage's claim and it had no expenditures for legal fees in the fiscal year 2000–01 and $14,064 in 2001–02. (There is some discrepancy regarding defendant's legal fee expenditures for the fiscal year 2001–02. Byers has testified that defendant spent $14,064 for that period, but defendant's May 2003 budget report indicates that the total defense spending was only $13,945, including legal fees. Both parties have accepted the $14,064 figure and neither has explained what additional professional services it paid for in 2001–02.) By comparison, defendant's legal fee expenses were $10,889 in the fiscal year 1995–96, $17,433 in 1996–97, $73,375 in 1997–98, $10,181 in 1998–99 and $1,432 in 1999–2000.

Defendant has a general policy that provides as follows:

1) It is the policy of USU to provide representation to its members in disputes with the employer through internal volunteer representatives. 2) It is the policy of USU not to provide representation to its members in disputes with the employer through outside retained attorneys unless: a) No internal union representatives are available, or b) The relevant proceedings or forum requires legal representation (e.g. judicial proceedings). 3) It is the policy of the USU that the USU is obligated for no attorney fees incurred by any members unless the use of a retained attorney has been approved in writing in advance by the USU Board of Directors (or in an emergency when Board Directors' action is not possible, by the President).

## OPINION

### A. *Labor–Management Reporting and Disclosure Act*

■ The purpose of § 431(c) of the Labor–Management Reporting and Disclosure Act is to provide union members with the information necessary to take action in regulating the affairs of the union and deterring abuse of union funds. *Antal v. District 5, United Mine Workers of America,* 451 F.2d 1187, 1189 (3d Cir.1971). The provision was proposed by Senator Goldwater as an amendment to the Kennedy–Ervin bill, which was one of a number of labor reform bills being considered in 1959 and that led to the enactment of the Landrum–Griffin Act. *Mallick v. Intern. Brotherhood of Elec. Workers,* 749 F.2d 771, 776 (D.C.Cir.1984). These bills were introduced after congressional investigations revealed that many union officials had run unions as "private fiefdoms" without regard to member interests. *Id. See* Interim Report of the Select Committee on

Improper Activities in the Labor or Management Field, S.Rep. No. 1417, 85th Cong., 2d Sess. 4–6 (1958). The bill's supporters wanted to deter unions from filing false reports with the Secretary of Labor but recognized that the Secretary had limited resources to check the accuracy of the reports. Permitting union members to verify the reports would not only help insure their accuracy but would make union officials more responsive to their membership. *See* 105 Cong. Rec. 6520 (1959) (memorandum of Sen. Goldwater). However, Senator John Kennedy was concerned that this provision could be abused by union members to harass union officials or to pass confidential information to management. *Mallick,* 749 F.2d at 778. The amendment was limited so that members would have a right to access union documents only when they had "just cause." *Id.*

Subsection (a) of 29 U.S.C. § 431 requires labor unions to file a report with the Department of Labor containing certain administrative information such as name, location, dues assessments and officer information. Subsection (b) requires unions to file annual LM–2 financial disclosure reports, on which legal service expenditures must be reported. Subsection (c) then requires unions to make available to its members all information in these reports and to permit them "for just cause to examine any books, records, and accounts necessary to verify such reports."

Defendant files annual LM–2 reports in compliance with these provisions. Defendant's LM–2 reporting period and fiscal year both run from September 1 through August 31. The Department of Labor's instructions for reporting professional fees require unions to "enter [the] organization's total disbursements for outside legal and other professional services ... not includ[ing] direct and indirect disbursements to officers and employees."

In deciding this issue, I note that there are a number of genuine factual disputes relating to the potential violation by defendant of its policies and by-laws in the hiring and payment of Cross. However, violations of these rules would not establish just cause even if proved and for that reason, they do not preclude a grant of summary judgment. *Donald v. Polk County,* 836 F.2d 376, 379 (7th Cir.1988) (disputed facts will not bar summary judgment unless facts are material).

### B. *Notice*

Before determining the issue of just cause, I must decide whether plaintiff can bring this action without making a good faith showing to the union. Some courts have extrapolated such a requirement from § 431(c). *See, e.g., Fruit & Vegetable Packers and Warehousemen Local 760 v. Morley,* 378 F.2d 738, 742–43 (9th Cir. 1967) ("it is only reasonable that the union have the first opportunity to consider any alleged just cause presented by its members"). Those courts recognizing the requirement added it apparently in the hope that a union would voluntarily comply with its duty to turn over documents when it learns of the good cause. *Id.* It is doubtful that this circuit would require a member to present just cause to the union before instituting a suit. In *Kinslow v. American Postal Workers Union, Chicago,* 222 F.3d 269, 275 (7th Cir.2000), the court of appeals questioned *Morley's* premise that a plaintiff could avoid a lawsuit by making a preliminary showing of good cause. The court noted that a corrupt union might be less inclined to cooperate when it becomes aware that it is the subject of suspicion and that "even if the rationale underlying the [advance notice requirement] were sound, the desire to encourage the settlement of the claim without litigation is hardly a sufficient basis for whittling away a union member's statutory rights." *Id.*

In *Kinslow,* however, the court did not conclusively reject the notice requirement because it found that all three of the recognized exceptions to advance notice were satisfied. *Kinslow,* 222 F.3d at 275. 1) The union had waived the requirement by failing to ask for the reasons; 2) a reasonable union member would have believed it would be futile to provide the reasons; and 3) the basis for the member's suspicions should have been known to the union officials. *Id. See Retana v. Apartment, Motel, Hotel and Elevator Operators Union, Local No. 14, AFL–CIO,* 453 F.2d 1018, 1027 (9th Cir.1972); *Morley,* 378 F.2d at 743. In this case, it is equally unnecessary to resolve the advance notice issue because neither the reasons plaintiff may have given defendant before instituting this suit nor any he sets forth in this litigation meet the just cause standard.

## C. *Just Cause*

The text of § 431(c) provides specifically:

> Every labor organization required to submit a report under this subchapter shall make available the information required to be contained in such report to all of its members, and every such labor organization and its officers shall be under a duty enforceable at the suit of any member of such organization . . . to permit such member for just cause to examine any books, records, and accounts necessary to verify such report.

Just cause is not defined elsewhere in the statute, leaving to the courts the task of trying to determine what it means. "As the various theories of the parties and the rather tangled web of judicial decisions concerning [this] subsection make plain, its language is simply too general and ambiguous" to determine its exact meaning. *Mallick,* 749 F.2d at 776.

■ In the absence of a clear statutory directive, the Court of Appeals for the Seventh Circuit has recognized that just cause is shown either (1) when "the union member had some reasonable basis to question the accuracy of the LM–2 or the documents on which it was based," or (2) when "information in the LM–2 has inspired reasonable questions about the way union funds were handled." *Kinslow,* 222 F.3d at 274. With respect to this first category, the amendment's supporters assumed that plaintiffs have just cause when they can show some reason to believe that the LM–2 report or the documents underlying it are inaccurate. *Mallick,* 749 F.2d at 778, citing 105 Cong. Rec. 6520 (1959) (remarks of Sen. Goldwater) ("I should like to make it possible for a union member who believes something is wrong with the bookkeeping . . . to have access to the books."). In interpreting the provision, courts have recognized this means of establishing just cause. *See, e.g., Morley,* 378 F.2d at 744 (discrepancy between statement and its supporting schedule and annual report); *Deacon v. Operating Engineers Local 12,* 236 Cal.App.2d 302, 46 Cal.Rptr. 11, 52 LC 16,609 (Calif.Super.Ct.1965) (officer claimed he did not incur reported amount). *See also Flaherty v. Warehousemen, Garage and Service Station Employees' Local Union No. 334,* 574 F.2d 484, 486 (9th Cir.1978) ("the purpose for the inquiry into the union's records must be to examine the basis for the union's financial report").

To establish just cause, a union member need have only minimal suspicion that the reports or underlying documents are inaccurate. *Morley,* 378 F.2d at 744. "It need not be enough to convince a reasonable man that some wrong has been done; it is enough if a reasonable union member would be put to further inquiry." *Id.* However, this first category of "just cause" is not relevant in the present case because plaintiff has never questioned the accuracy of either defendant's LM–2 or Cross's bill.

The second means for establishing just cause recognized in this circuit (where "information in the LM–2 has in spired reasonable questions about the way union funds were handled") was adopted from a decision by the Court of Appeals for the District of Columbia. *Kinslow,* 222 F.3d at 274, n. 2, citing *Mallick,* 749 F.2d at 781. In *Mallick,* the court of appeals rejected the district court's holding that the union member had not established just cause because he had not shown that the LM–2 was "untruthful, inaccurate, or incomplete." *Mallick,* 749 F.2d at 776. After an extensive review of the provision's legislative history, the court noted that it is more consistent with the policies of the act to extend the right of examination beyond "a check on the union's arithmetic." *Id.* at 781. It held that a union member establishes just cause when he "points to a sudden, apparently significant, and unexplained change on his union's LM–2 report." *Id.* The court reasoned that "union members will be interested in looking at underlying records precisely because they believe the LM–2 reports *are* accurate, and raise questions about the handling of union funds." *Id.* In essence the court held that "just cause" is not limited to suspicion that the LM–2 is inaccurate, but also exists when the presumptively correct numbers on the report generate suspicion of financial mismanagement. *See id.*

1. *Professional fee disparity between 2000–01 and 2001–02 LM–2*

█ Plaintiff points to the jump in professional fee expenses reported on defendant's 2000–01 LM–2 and its 2001–02 LM–2 as grounds for just cause. Not every change in figures reported on LM–2 reports establishes just cause. Only when a change is "sudden, apparently significant and unexplained" is it regarded as suspicious enough to put a reasonable union member to further inquiry. *See Mallick,* 749 F.2d at 781; *Kinslow,* 222 F.3d at 274

n. 2. Defendant reported $6,974 in professional fees on its 2000–01 LM–2 and $15,307 on its 2001–02 LM–2. Although plaintiff had not yet seen the 2001–02 LM–2 when he filed this suit, this does not prevent him from advancing the discrepancy as a basis for just cause. *See Spinowitz v. Herrity,* 672 F.Supp. 670, 673 (E.D.N.Y. 1987) (union could theoretically be required to disclose information for fiscal year for which LM–2 not yet filed); *Campbell v. Transport Workers Union of America, AFL–CIO,* 151 L.R.R.M. 2837 (E.D.Pa.1996) (claimant wanted to verify numbers reported on LM–2s he had looked at for first time after filing suit).

However, "changes in certain expense items that were ... readily explainable by information known by plaintiff when he first reviewed the LM–2 reports ... do not constitute just cause ... because they would not put a reasonable union member to further inquiry." *Campbell,* 151 L.R.R.M. at ¶ 28. At the time plaintiff filed this suit (and before he had seen the 2001–02 LM–2) he knew that the union had paid Cross's $12,906.61 bill in its entirety sometime late in the 2001–02 fiscal year. *Compare Mallick v. Intern. Brotherhood of Elec. Workers (Malick II),* 814 F.2d 674 (D.C.Cir.1987) (member knew of disparity on LM–2 only but did not even know what portion of the professional fees were for legal services or representation in a particular matter). Plaintiff knew that none of Cross's fees had been reported on the 2000–01 LM–2. Finally, he knew that the bill was for services rendered over the course of 12 months, the first four of which were in the 2000–2001 fiscal year. From this, plaintiff should have anticipated that the 2000–01 LM–2 would be artificially low and the 2001–02 LM–2 artificially high. In fact, if a one-third pro rata share of the Cross bill is applied to the 2000–01 fiscal year and deducted from the 2001–02 fiscal year, the professional fees incurred each

year would be $11,276 and $11,005, respectively. Thus, the disparity does not give rise to just cause because it was readily explainable by information known by plaintiff. A reasonable union member with this knowledge would not have been put to further inquiry.

Plaintiff also argues that defendant's failure to account for legal fees as they accrue might generate reasonable suspicion. However, plaintiff was aware that defendant did not know the amount that had accrued to Cross during the 2000–01 fiscal year until Cross submitted her bill in April 2002.

Further, the disparity is not sufficiently significant. Those courts deriving just cause from significant changes in numbers reported from one year to the next did so where the disparities were of a much greater magnitude than the change in the present case. In this case, the difference in professional fees reported on defendant's 2000–2001 LM–2 compared with its 2001–2002 LM–2 amounts to $8,333. By contrast, *Mallick*, 749 F.2d at 775, involved a decrease of nearly $400,000 in the balance of a fund the union maintained for legal expenses. A number of cases following *Mallick* involved equally large sums of money. *See, e.g., Smith v. McCarthy*, 723 F.Supp. 173 (D.D.C.1989) ($1.5 billion in commercial paper transactions); *Spinowitz*, 672 F.Supp. 670 ($30,-000 total disparity over two years, $20,000 of which was for professional fees, plus over $13,000 in unspecified "other disbursements"); *Cook v. Teamsters Local 705*, 1997 WL 433659 (N.D.Ill.1997) (decrease of nearly $2 million in net assets over two years). Disparities involving smaller sums have been recognized only where there is an inconsistency between the amount reported on the LM–2 and some other financial statement for that *same* year. *See, e.g., Campbell*, 151 L.R.R.M. 2837 ($3,000 discrepancy between LM–2 amount and annual financial statement given to members for that same years establishes just cause). In light of these cases, it does not appear that the increase in professional fees reported between the 2000–01 and 2001–02 LM–2s in this case meets *Mallick's* requirement that the increase be "significant."

Finally, this case can be distinguished from *Mallick* in a third way. In *Mallick*, 749 F.2d at 775, there had been a decline of about 8% in a legal defense fund in one year. 749 F.2d at 775. In the preceding seven years, the balance had not varied by more than 1%. The court reasoned that the prior stability made the change appear more significant. *Id.* at 783. By contrast, the only consistent aspect of defendant's annual legal fee expenditures is that they fluctuate. Expressed in percentages, defendant's legal expenses increased 60%, then increased 320%, then decreased 620% and then decreased 610% in the successive fiscal years between 1995–96 through 1999–2000. The increase in expenditures in the following two years is not a deviation from the normal fluctuations in defendant's legal service expenditures.

### 2. Potential violation of internal union policy

█ Plaintiff asserts that the hiring, supervision and payment of Cross may have violated three of defendant's internal rules. First, he contends that defendant's hiring of Cross violated its policy that it is "not to provide representation to its members in disputes with the employer through outside retained attorneys unless no internal union representatives are available or the relevant proceedings or forum requires legal representation." Second, plaintiff argues that defendant violated its by-law requiring board approval of any expenses exceeding budgeted amounts and notification to the general membership of the

amount and rationale for such authorization. Third, plaintiff contends that the money paid to Cross relating to the Armitage bill was misappropriated because the work she performed violated defendant's general policy against providing outside legal representation for members in disputes with their employers.

Plaintiff's assertion demonstrates his lack of just cause under § 431. He does not allege that the violation of these internal rules causes him to suspect that the LM–2 reports are inaccurate or that information on the LM–2 has inspired reasonable questions about the way defendant handled its funds except in the most generalized way. *See Kinslow*, 222 F.3d at 274. Although *Kinslow* does not state explicitly that just cause could be established *only* in one of these two circumstances, it seems likely that this was intended. *Id.* ("The just cause requirement simply entails a showing that the union member had some reasonable basis to question the accuracy of the LM–2 or the documents on which it was based, or that information in the LM–2 has inspired reasonable questions about the way union funds were handled."). The statute's structure indicates that just cause ought to relate to the LM–2. Document disclosure pursuant to § 431(c) is a supplement to the reporting requirements defined in subsections (a) and (b). Congress could have made this disclosure provision an independent section of the act, but made it an appendage instead.

Other circuits have stated more explicitly that just cause must relate to the LM–2. *See Flaherty*, 574 F.2d at 486 (summary judgment for union was appropriate where member's reasons for wanting to see the documents were unrelated to LM–2); *Mallick*, 749 F.2d at 783 (confirming that "political opposition to union officials, unaccompanied by any specific concern with transactions summarized on the LM–2 re-

port, does not constitute just cause for rummaging through all the union records."). Additionally, plaintiff has not pointed to any case to the contrary. Plaintiff cites *Campbell*, 151 L.R.R.M. at 2841, as standing for the proposition that just cause need not be based on a question about the LM–2. To support this contention, plaintiff quotes the following passage: "just cause is not limited to those situations where the accuracy of the figures reported in the LM–2 form; it also encompasses those situations where the assumedly accurate figures [*on the LM–2*] would cause a reasonable union member to have questions about the handling of union funds." *Id.* at 2841. However, this passage does nothing more than confirm *Kinslow's* second category, that the LM–2 has inspired reasonable questions about the handling of union funds.

Plaintiff has cited both *Morley* and *Sonsten v. Melendrez*, 374 F.Supp. 1028 (N.D.Cal.1974) for the premise that just cause is established when a union official fails to voluntarily provide a specific explanation for a particular expenditure. However, in both of these cases, a union member questioned the accuracy of the LM–2 figures. Thus, both fit within *Kinslow's* first category. *Morley*, 378 F.2d at 744; *Sonsten*, 374 F.Supp. at 1029. In any event, the argument that just cause is established whenever a union official refuses to provide members with any and all information on request must fail because it is based on circular reasoning that would effectively eliminate the just cause limitation. The negative implication of § 431(c)'s requirement that union officials disclose certain documents when presented with just cause is that disclosure is not required until this showing has been made. Members do not bring § 431(c) actions unless a union withholds certain information.

Even if these rule violations could establish just cause to see *some* documents, plaintiff has failed to identify what he suspects he may discover by examining Cross's bill that relates to the infractions. The legislative history of the just cause requirement shows that the Senate intended judicial borrowing from the laws of shareholder's rights to examine corporate books. *Mallick,* 749 F.2d at 781. In that context, the rule has been stated more explicitly that a shareholder must allege facts that are sufficiently specific such that "mention of them [would] tend[ ] to show that plaintiff was not merely on a fishing expedition and that he had some specific basis for his demand." *Nodana Petroleum Corp. v. State,* 123 A.2d 243, 246 (Del.1956). It is not enough to indicate a general "concern that improper transactions might have occurred" and a wish to inspect the company's books "in order to determine ... the extent, if any, to which such transactions might have occurred." *Id.; Fleisher Development v. Home Owners Warranty Corp.,* 856 F.2d 1529, 1535 (D.C.Cir.1988). Requiring the identification of a *particular* act of suspected wrongdoing assures that inspection is sought for a proper purpose. *Fleisher,* 856 F.2d at 1536.

Plaintiff has argued only that he should be afforded access to Cross's bill "in order to ensure the appropriate and democratic operation of his union" or because he wishes to ensure that money has not been inappropriately paid out. He has never asserted that Cross overcharged for her work, such as by billing at too high an hourly rate, billing for work she never performed or failing to use good judgment in deciding what work to do. Plaintiff has all the information he needs to pursue his contention that defendant violated its internal rules when it hired Cross to investigate Armitage's charges against him and Palek. Plaintiff has argued that "it is completely immaterial what [he] would

chose to do with the bill." However, it is entirely material that he be able to use the document to advance his just cause if he so chooses. *See Fleisher,* 856 F.2d at 1537 (only documents that are relevant to the proper purpose are subject to court-ordered inspection).

Reading *Kinslow* to mean that just cause is established *only* where "the union member had some reasonable basis to question the accuracy of the LM–2 or the documents on which it was based, or that information in the LM–2 has inspired reasonable questions about the way union funds were handled," would be consistent with the holdings in other circuits and the statute's structure. Because plaintiff does not question the accuracy of the LM–2 or point to anything on the LM–2 that would inspire reasonable suspicion that union funds were being mishandled, he has not shown just cause pursuant to § 431(c) as understood in this circuit. Although the just cause requirement ought to remain minimal to permit liberal access to union records and disclosure may frequently be desirable for better oversight of union affairs generally, a union member may not use § 431(c) as a subterfuge to get documents for purposes Congress did not intend. *Flaherty,* 574 F.2d at 486 ("While access to union records might indeed result in more intelligent voting, and hence be desirable, that is not the purpose of section 431(c)").

## ORDER

IT IS ORDERED that defendant's motion for summary judgment is GRANTED and plaintiff's motion for summary judgment is DENIED. The Clerk of Court is directed to enter judgment in favor of defendant and close this case.